## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

COMPASS MARKETING, INC.                    :
105 Eastern Avenue                         :        Case Number: _____
Annapolis, Maryland 21403                  :
(Anne Arundel County),                     :
                                           :
            *Plaintiff*,                    :
       v.                                  :
                                           :
FLYWHEEL DIGITAL LLC                        :
1801 Porter Street Suite 300               :
Baltimore, Maryland 21230                  :
(Anne Arundel County),                     :
                                           :
JAMES COLUMBUS "CHIP" DIPAULA, JR.         :
11 Devon Hill Road, Unit 4B                :
Baltimore, Maryland 21210                  :
(Baltimore County),                        :
                                           :
PATRICK MILLER                             :
743 Bywater Road                           :
Gibson Island, Maryland 20008              :
(Anne Arundel County),                     :
                                           :
DANIEL WHITE                               :
21900 Fairway Drive                        :
Leonardtown, Maryland 20659                :
(St. Mary's County),                       :
                                           :
MICHAEL WHITE                              :
39650 Hiawatha Circle                      :
Mechanicsville, Maryland 20659             :
(St. Mary's County),                       :
                                           :
GEORGE WHITE                               :
15125 Woodville Road                       :
Waldorf, Maryland 20601                    :
(Charles County), and                      :
                                           :
ASCENTIAL PLC,                             :
The Prow, 1 Wilder Walk                    :
London, England W1B 5AP.                    :
                                           :
            *Defendants*.                   :
                                           :

**<u>COMPLAINT AGAINST</u>**
**<u>FLYWHEEL DIGITAL LLC AND RELATED PARTIES</u>**

**TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................................ 1

THE PARTIES .................................................................................................................... 5

JURISDICTION AND VENUE ......................................................................................... 7

FACTUAL BACKGROUND ............................................................................................. 9

A. Compass Origins and Longstanding Investment in the eCommerce Space ............ 9

    I.     Compass Recognizes the eCommerce Opportunity ......................................... 9

    II.    Compass Builds Out Its Operations to Assist Clients on the Amazon Platform .......... 15

    III.   Compass Develops Valuable Trade Secrets and Proprietary Business Know How that Position it for Success ..................................................................... 18

    IV.   The eCommerce Guide Teaches the Compass Trade Secrets and Compass Implements Reasonable Measures to Protect These Valuable Assets ........................... 20

B. DiPaula & Miller Secretly Found a Competing eCommerce Marketing Company Called Flywheel ..................................................................................................... 24

    I.     DiPaula and Miller Leave Compass .............................................................. 24

    II.    DiPaula and Miller Poach Compass's eCommerce Team ............................. 26

C. Compass Opens an Internal Investigation into Michael and Daniel White .......................... 28

    I.     The Secret Compass Bank Account Scheme (Money Laundering, Embezzlement, Mail Fraud & Wire Fraud) .................................................... 31

    II.    The Ghost Employee Scheme (Embezzlement) ............................................. 32

    III.   The IRS Tax Check Scheme (Embezzlement) ................................................ 33

    IV.   The Shareholder Loan Scheme (Embezzlement) ............................................ 34

    V.    Information Technology Lockout of Compass Business Records and Accounts (Attempted Extortion) ..................................................................... 36

    VI.   Sham Legal Campaign ................................................................................... 39

    VII.  Anonymous Campaign Against Compass (Mail and Wire Fraud) ............................. 40

    VIII. Personal Use of Compass Corporate Credit Cards (Embezzlement) ............................. 41

D. Compass Discovers Miller, DiPaula, and Flywheel's Trade Secret Theft ............................ 42

E. Compass Discovers Michael and Daniel White are Connected to Miller, DiPaula, and Flywheel's Trade Secret Theft ................................................................................... 48

F. Ascential's Role as a Co-Conspirator in Flywheel's Misappropriation of Compass's Trade Secrets ........................................................................................................... 50

    I.     Ascential Receives Notice of the Flywheel's Improper Origins and Opts to Perpetuate the Harms Against Compass ......................................................... 51

i

COUNT I – DEFEND TRADE SECRETS ACT OF 2016 (DTSA) (Flywheel, DiPaula, Miller, and Ascential) ........................................................................... 54

COUNT II MARYLAND UNIFORM TRADE SECRETS ACT (MUTSA) (Flywheel, DiPaula, Miller, and Ascential) ...................................................................... 54

COUNT III – CIVIL RICO 18 U.S.C. § 1962(c) (All Defendants) ........................................... 59

COUNT IV – CIVIL RICO CONSPIRACY 18 U.S.C. 1962(d) (All Defendants) .................... 61

COUNT V – BREACH OF CONTRACT (DiPaula & Miller) ..................................................... 63

COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACT (DiPaula, Miller, and Flywheel) ........................................................................................................ 65

COUNT VII – TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE (Flywheel, DiPaula, Miller) ................................................................................ 66

COUNT VIII – UNFAIR COMPETITION (Flywheel, DiPaula, Miller, and Ascential) ........... 66

COUNT IX – UNJUST ENRICHMENT (DiPaula, Miller, Flywheel, and Ascential) .............. 67

COUNT X – FRAUDULENT CONCEALMENT/FRAUD (All Defendants) ........................... 69

COUNT XI – CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS (All Defendants) ....................................................................................................... 70

COUNT XII – CONSPIRACY TO BREACH CONTRACT (DiPaula & Miller) ...................... 71

COUNT XIII – CONSPIRACY TO TORTIOUSLY INTERFERE WITH CONTRACTS (DiPaula, Miller, and Flywheel) ...................................................................... 72

COUNT XIV – CONSPIRACY TO TORTIOUSLY INTERFERE WITH PROSPECTIVE ADVANTAGE (DiPaula, Miller, and Flywheel) ..................................... 72

COUNT XV – CONSPIRACY TO UNFAIRLY COMPETE (All Defendants) ........................ 72

COUNT XVI – CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT/FRAUD (All Defendants) ....................................................................... 73

COUNT XVII – AIDING AND ABETTING MISAPPROPRIATION OF TRADE SECRETS (DiPaula, Miller, and Flywheel) ............................................................. 74

COUNT XVIII – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH CONTRACTS (DiPaula, Miller, and Flywheel) ..................................................... 74

COUNT XIX – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE (DiPaula, Miller, and Flywheel) ..................................... 75

COUNT XX – AIDING AND ABETTING UNFAIR COMPETITION (DiPaula, Miller, and Flywheel) .................................................................................................. 75

COUNT XXI – AIDING AND ABETTING FRAUDULENT CONCEALMENT/FRAUD (All Defendants) ....................................................................... 75

COUNT XXII – CONVERSION (Michael and George White) ................................................. 76

COUNT XXIII – BREACH OF FIDUCIARY DUTY ............................................................. 77

ii

JURY DEMAND ............................................................................................................... 78

PRAYER FOR RELIEF ................................................................................................... 78

Plaintiff Compass Marketing, Inc. ("Compass"), by and through its undersigned counsel, files this Complaint against Defendants Flywheel Digital LLC ("Flywheel"), James Columbus "Chip" DiPaula, Jr. ("DiPaula"), Patrick Miller ("Miller"), Daniel J. White ("Daniel" or "Daniel White"), Michael R. White ("Michael" or "Michael White"), George White ("George" or "George White"), and Ascential PLC ("Ascential") (collectively "Defendants"), and states as follows:

## NATURE OF THE ACTION

1.      This lawsuit seeks redress for extensive, pervasive, wrongful, and actionable misconduct committed by each of the named defendants, including years of covert trade secret theft, that has inflicted grievous financial harm on Compass. Individual Defendants DiPaula and Miller are former Compass executives who were given the opportunity to run the best-in-class electronic commerce ("eCommerce") marketing arm for Compass. DiPaula and Miller were trusted with, and permitted to immerse themselves in, Compass's most sensitive trade secret information and proprietary business know how that Compass had been developing for more than a decade. Unbeknownst to Compass, DiPaula and Miller secretly secured embezzled Compass funds from former Compass directors Daniel White and Michael White, and launched and thereafter operated a competing company, Defendant Flywheel. Flywheel has competed with Compass ever since and has done so by misusing stolen trade secrets and proprietary information while poaching Compass's clients and leveraging myriad former Compass eCommerce employees. Defendants DiPaula, Miller, Michael White, and Daniel White have conspired to conceal their misappropriation and cover up their actionable misconduct. Their acts in furtherance of this conspiracy continue to present, as set forth in detail in this Complaint.

2.      Compass is a marketing company that was founded in 1998 prior to the rise of eCommerce platforms that fundamentally changed the way consumers interact with and purchase

1

retail goods. At its start, Compass assisted Fortune 100 companies that sold consumer packaged goods ("CPGs") in brick-and-mortar stores. In 2005, as consumer access to the internet expanded, Compass added online marketing eCommerce services to its CPG clients to support sales to online retailers including Staples.com, OfficeDepot.com, OfficeMax.com, SamsClub.com, Walmart.com, and Amazon.com.

3.      Compass was introduced to Amazon, which at the time was an internet bookstore looking to expand its portfolio of products offered into the online shopping market by adding CPG products. Compass then began helping its CPG clients position, advertise, and sell products to online retailers, including on www.amazon.com (hereinafter, the "Platform" or "Amazon platform"). It was an instant success. Within several years, Compass had a dedicated eCommerce Department that served the biggest CPG manufacturers in the world on the Amazon platform, as well as on the Staples, Office Depot, and other online retailer platforms.

4.      Compass spent years and invested substantial resources perfecting its proprietary business methods, processes, and platform communication strategies to allow Compass to drive sales of its clients' products, including on the Amazon platform. Prior to 2016, Amazon offered no back-end automation or application programming interface ("API") for sellers on its Platform. Consequently, Compass created an integrated set of processes to manually interact with the Platform. The Compass eCommerce team developed deep expertise by, among other things, downloading Amazon data, querying that data through keyword searches, and then manually entering data inputs into Compass internal spreadsheets and software to develop proprietary formulas, methods, strategies, and tools (including formulas) to interact with the Platform.

5.      In 2010 and 2011, Compass hired DiPaula and Miller to run the eCommerce team. DiPaula and Miller lacked any experience or familiarity with the CPG industry or the emerging

eCommerce space. Compass trained DiPaula and Miller on its proprietary business methods, processes, and platform communication strategies. DiPaula and Miller subsequently emerged as what Compass then believed to be trusted senior executives who ran the fastest growing part of Compass.

6.      What Compass (i) did not know in 2014, (ii) did not and could not have known when DiPaula and Miller launched Flywheel, and (iii) did not and could not have known when DiPaula and Miller resigned from Compass and, later in 2016, poached virtually all its eCommerce talent, was that DiPaula and Miller, upon information and belief using in whole or part embezzled funds from Compass, secretly built Flywheel upon the trade secret information and proprietary business know how that rightfully belonged to Compass following more than a decade of intensive and expensive research and development. Indeed, due to extensive and ongoing concealment efforts, Compass did not learn until 2020 that DiPaula and Miller stole and used Compass materials to build out Flywheel as an enterprise to eventually offer identical services as Compass to the identical Compass clients and customers.

7.      From its inception, though unbeknownst to Compass, Flywheel conspired to compete unfairly, both by using Compass's secretly stolen intellectual property, while concealing the fraud, and by spreading false information about Compass, all the while poaching flagship Compass clients and customers.

8.      By the time the extensive and brazen conspiracy by DiPaula, Miller, Daniel White, and Michael White was discovered, and Compass initiated an investigation into it and the surrounding misconduct discovered as set forth in this Complaint, Flywheel had leveraged the stolen trade secrets and proprietary information to turn itself into what Compass was on the trajectory towards becoming based on all of its invaluable intellectual property before the theft.

9.      In just a few years, the startup Flywheel, turned its theft into a company that was acquired by the United Kingdom-based, international conglomerate Ascential.  Ascential either knew or should have known of the genesis of Flywheel's brazen origins, or it acted in reckless disregard of facts that it should have investigated in connection with its due diligence, or it took a "see no evil, hear no evil, focus on financial upside" approach to the acquisition. Ascential rewarded the theft and misconduct by paying up to $400 million to acquire Flywheel, with an up-front payment of $60 million and the possibility of as much as an additional $340 million based on contingencies tied to aggressive growth performance metrics. The structure and payment terms of the Ascential acquisition of Flywheel created a strong financial incentive and motive for Flywheel to continue its fraudulent concealment and its poaching of Compass clients.  Ascential has had to restate its estimated acquisition cost because of the extraordinary growth of Flywheel since the purchase, based on core intellectual property stolen from Compass. Further, Ascential has pivoted its 100 year-old company, according to its most recent interim report, to focus virtually exclusively on the CPG and eCommerce markets, since its acquisition of Flywheel.

10.     Today, notwithstanding that Compass has informed Ascential's executive management and Board of Directors of the material facts underlying the theft and wrongful conduct by Flywheel, DiPaula, and Miller, Ascential has elected to act in concert with Flywheel to further the misappropriation of Compass's trade secrets and proprietary business know how, unfairly compete with Compass, conceal the theft, sabotage Compass's business, and perpetuate the widespread fraud that drives Flywheel's success.

11.     On January 20, 2020, during the course of a review, Compass's Controller located on the internet a Flywheel-branded Power Point presentation created by Patrick Miller that

4

revealed, for the first time, that Flywheel had stolen and was continuing to misuse for unauthorized purposes Compass's trade secrets and proprietary business know how.

12. Upon information and belief, the metadata revealed that the Flywheel-branded Presentation was created in 2013, when DiPaula and Miller worked at Compass.

13. Compass is pursuing this action against Defendants seeking compensatory damages, punitive damages, treble damages, a court order, injunctive relief, and fees and costs for Defendants' misappropriation of Compass's trade secrets under the Defend Trade Secrets Act ("DTSA") (Count I) and under the Maryland Uniform Trade Secrets Act ("MUTSA") (Count II), for Racketeer Influenced and Corrupt Organizations ("RICO") Act violations (Count III), RICO civil conspiracy (Count IV), breach of contract (Count V), tortious interference with contracts (Count VI), tortious interference with prospective advantage (Count VII), unfair competition (Count VIII), unjust enrichment (Count IX), fraudulent concealment (Count X), conspiracy (Counts XI-XVI), aiding and abetting claims (Counts XVII-XXI), conversion (Count XXII), and breach of fiduciary duty (Count XXIII).

## THE PARTIES

14. Plaintiff Compass is incorporated in the Commonwealth of Virginia and is a foreign corporation registered with the state of Maryland. Its principal place of business is located at 105 Eastern Avenue, Annapolis, Maryland, 21403. At all relevant times herein, Compass has been in good standing with the Commonwealth of Virginia and State of Maryland.

15. Defendant Flywheel is a Maryland limited liability company licensed to do business in the State of Maryland. Its principal place of business is located at 1801 Porter St., Suite 300, Baltimore, MD 21230. Flywheel is an eCommerce marketing company built using Compass's stolen trade secrets and proprietary information and know how, as well as built upon information and belief in whole or in part on funds embezzled from Compass. DiPaula and Miller incorporated

5

Flywheel on September 3, 2014, the day before they both resigned from Compass. On information and belief, since its formation through the present, Flywheel's Board of Governors and/or registered agents have been comprised by individual defendants DiPaula and Miller, Ascential CEO Duncan Painter, and Ascential CFO Mandy Gradden, as well as non-party individuals Dayna Acevedo, Shiwen Xu, and Rachel McGuckian.

16.     Defendant Chip DiPaula is an individual and resident of Baltimore County, Maryland. DiPaula served as Senior Vice President of the Compass International Division from March 1, 2010 to 2012, and as Executive Vice President managing the Compass eCommerce team from 2012 until he resigned from the company on September 4, 2014. While still employed at Compass, DiPaula founded Flywheel with Patrick Miller.

17.     Defendant Patrick Miller is an individual and resident of Anne Arundel County, Maryland. Miller was Vice President of Digital Strategy for the Compass eCommerce team from January 31, 2011 until he resigned from the company on September 4, 2014. While still employed at Compass, Miller founded Flywheel with DiPaula.

18.     Defendant Daniel White is an individual and resident of St. Mary's County, Maryland. Daniel served as Compass legal counsel and acted as its General Counsel from 1998 to November 23, 2018 and was a member of the Compass Board of Directors from 1998 to February 14, 2019. Daniel currently owns 150 shares of Compass, which represents a 16.6% ownership stake in the company. Daniel is the brother of Compass's Executive Chairman John White, and of individual Defendant Michael White.

19.     Defendant Michael White is an individual and a resident of St. Mary's County, Maryland. Michael was Vice President of Operations and Comptroller of Compass from 2011 to November 23, 2018 and was a member of the Compass Board of Directors from 2011 until

6

February 14, 2019. Michael currently owns 150 shares of Compass, which represents a 16.6% ownership stake in the company.

20.     Defendant George White is an individual and resident of Charles County, Maryland. George worked at Compass managing Compass's IT systems from January 1, 2004 to April 29, 2019. George is the son of individual defendant Michael White.

21.     Defendant Ascential is a public limited company in the United Kingdom, with its principal place of business at The Prow, 1 Wilder Walk, London, England W1B 5AP. Ascential operates offices internationally and throughout the United States, including in Maryland. Ascential acquired Flywheel on or around November 1, 2018.

## JURISDICTION AND VENUE

22.     This Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Compass asserts a claim under 18 U.S.C. § 1836, The Defend Trade Secrets Act ("DTSA"). This Court has supplemental or pendant jurisdiction over Compass's remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so related to Compass's DTSA claim that they form part of the same case or controversy under Article III of the United States Constitution.

23.     Alternatively, this Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Compass asserts a claim under 18 U.S.C. § 1965, the RICO Act, against Defendants. This Court has supplemental or pendant jurisdiction over Compass's remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so related to the RICO claim that they form part of the same case or controversy under Article III of the United States Constitution.

24.     Defendant Flywheel is subject to personal jurisdiction in this Court by virtue of being a Maryland corporation, having a principal place of business in Maryland, doing business in

7

Maryland, engaging in tortious conduct in Maryland related to the misappropriation and use of Compass's trade secrets, having contact with Maryland in furtherance of a conspiracy, and interfering with Compass's valid and enforceable Maryland contracts.

25.     Defendant DiPaula is subject to personal jurisdiction in this Court by virtue of being a citizen and resident of Maryland, doing business in Maryland, engaging in tortious conduct in Maryland related to the misappropriation and use of Compass's trade secrets, having contact with Maryland in furtherance of a conspiracy, and entering into valid and enforceable Maryland contracts among other wrongful acts that relate to this litigation.

26.     Defendant Miller is subject to personal jurisdiction in this Court by virtue of being a citizen and resident of Maryland, doing business in Maryland, engaging in tortious conduct in Maryland related to the misappropriation and use of Compass's trade secrets, having contact with Maryland in furtherance of a conspiracy, and entering into valid and enforceable Maryland contracts among other wrongful acts that relate to this litigation.

27.     Defendant Daniel White is subject to personal jurisdiction in this Court by virtue of being a citizen and resident of Maryland, doing business in Maryland, engaging in tortious conduct in Maryland, and having contact with Maryland in furtherance of a conspiracy, among other wrongful acts that relate to this litigation.

28.     Defendant Michael White is subject to personal jurisdiction in this Court by virtue of being a citizen and resident of Maryland, doing business in Maryland, engaging in tortious conduct in Maryland, and having contact with Maryland in furtherance of a conspiracy, among other wrongful acts that relate to this litigation.

29.     Defendant George White is subject to personal jurisdiction in this Court by virtue of being a citizen and resident of Maryland, doing business in Maryland, engaging in tortious

8

conduct in Maryland, and having contact with Maryland in furtherance of a conspiracy, among other wrongful acts that relate to this litigation.

30.     Defendant Ascential is subject to personal jurisdiction in this Court by virtue of doing business in Maryland, engaging in tortious conduct in Maryland related to the misappropriation and use of Compass's trade secrets, and having contact with Maryland in furtherance of a conspiracy. Ascential officers, including its CEO Duncan Painter and its CFO Mandy Gradden, served on the Flywheel Board of Directors, and upon information and belief, regularly travel to Maryland to manage Flywheel operations.

31.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

**FACTUAL BACKGROUND**

**A.  Compass Origins and Longstanding Investment in the eCommerce Space**

32.     Compass was founded on February 4, 1998, as a marketing company for CPGs. CPGs are products that customers consume and replace on a frequent basis. Examples of CPGs include beverages, cosmetics, and cleaning products.

33.     John White envisioned Compass as a company focused on the marketing evolution and expansion of the traditional marketplace for CPGs. Compass initially worked with manufacturers to place CPGs in brick-and-mortar big-box retailers and creative locations, such as the check-out counters of home improvement stores.

   **I.  *Compass Recognizes the eCommerce Opportunity***

34.     At the time Compass was founded, the eCommerce industry was in its infancy. Cadabra, Inc. (now known as Amazon.com, Inc.) launched its online bookstore four years prior, and eCommerce giants like Etsy and Alibaba did not exist. Foreseeing the massive need for its services in the eCommerce space, and the significant lucrative financial upside associated with

9

being one of the first developers of a proprietary eCommerce strategy, in 2005, Compass created its eCommerce digital marketing and sales service so it could market CPG clients' products online.

35.    The eCommerce expansion was a quick success. Compass represented iconic brands such as Splenda, Duracell, Neutrogena, Band Aid, Motrin, and Tylenol across Amazon, Target, Walmart, and Staples internet platforms, among many others listed below. Its revenue increased more than 1300% in only six years, increasing from $284,894 in 2002, to $3,779,203 in 2008.



Exhibit A to Complaint (hereinafter "Compass Marketing Deck"), Slide 66.

36.    John White recognized in the early 2000s that family norms in America had changed such that single family income was being replaced by dual family income (both members of a couple working). With Americans spending more time outside of the home, John White recognized that consumer behavior would continue to shift towards the convenience of purchasing consumer goods online.

10

37.    Compass saw Amazon as the future of eCommerce, correctly predicting by 2013 that "[t]he number of consumers researching or shopping online is steadily growing and will surpass 200 million by 2015." Compass understood that "Amazon customers are driven to purchase based on price, selection and convenience." Compass foresaw that pricing is "critical," but "shoppers are looking to save both time & money by shopping online." Compass was studying those "core drivers" that were "very important" to fueling the imminent online shopping explosion:



Compass Marketing Deck, Slide 60.

38.    Compass saw the online explosion coming a decade before it arrived. Compass estimated, based on internal Amazon data in 2013, that Amazon.com would be a $50 billion dollar business in the US by 2022. The actual growth has exceeded even Compass's lofty growth projections.



Compass Marketing Deck, Slide 96.

39.    Compass also predicted the sales opportunity in Amazon's nascent specialty channels, such as Amazon Fresh (groceries) and Amazon Supply (office supplies), and in the data-valuable search and social platform Amazon was building. The unique monthly visitors Amazon had in 2013 was 104 million in the US alone. Compass knew that optimizing its search campaigns for its clients would grow in value so Compass built unique processes and formulas to optimize its clients' campaigns. Today Amazon's unique monthly visitors exceed 2.5 billion worldwide.

40.    Compass positioned itself to be at the forefront of non-traditional channels of distribution for CPGs. Compass was at the ground level in assisting its clients to increase distribution and sales through eCommerce. In 2013, Compass positioned itself at the intersection of core growth areas underpinning eCommerce: sales, analytics, marketing, and logistics.

12



Compass Marketing Deck, Slide 10.

41.     Compass's early adoption of an eCommerce focus uniquely positioned the Company to grow alongside Amazon and other platforms. In 2013, Compass was primed for unparalleled success.



Compass Marketing Deck, Slide 12.

42.     By 2013, Compass was deeply invested in its partnership with Amazon, and that investment was paying dividends. Compass relied on its knowledge of best practices regarding

how to compete in this new retail channel to advise its clients. Compass also partnered with Amazon to launch the "Add-on Store" that has become a ubiquitous part of the Amazon shopping experience:



Compass Marketing Deck, Slide 80.

43.    Compass distinguished itself in the market by analyzing internal Amazon data, such as "market basket" data, to determine how to drive sales of its clients' products. The Company's analytics skillsets deepened such that by manually assessing Amazon data, Compass developed proprietary methods and protocols to increase page views and drive conversion that would been unachievable otherwise. Compass's clients realized astounding results by 2013 as a direct result of Compass's trade secrets and proprietary business know how.

14



Compass Marketing Deck, Slide 87.

## II. *Compass Builds Out Its Operations to Assist Clients on the Amazon Platform*

44.    Compass, due in large part to the early success of its eCommerce Department, secured significant growth from 2005 to 2014. Compass made significant operational investments in its eCommerce Department, including a college intern program specifically set up to recruit and hire students from the University of Maryland.

45.    On March 1, 2010, Compass hired Chip DiPaula as Executive Vice-President of the International Division. DiPaula accepted and entered into the "Agreement Relating to Employment and Post Employment") ("the DiPaula Agreement"). The DiPaula Agreement contained the following confidentiality provision:

> Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where recognized by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employment Agreement at 1.

46.    The DiPaula Agreement contained the following Non-Solicitation Agreement:

15

> During the period of Employee's employment with COMPASS and for a period of two years following the termination of Employee's employment, regardless of the reason for termination, Employee shall not, directly or indirectly: (i) induce or encourage any employee of COMPASS to leave the employ of COMPASS, (ii) hire any individual who is or was an employee of COMPASS as of the date of employee's termination of employment or within a one year period prior to such date, or (iii) induce or encourage any customer, client, potential customer, potential client and/or other business relation of COMPASS to not do business or cease or reduce doing business with COMPASS or in any way interfere with the relationship between any such customer, client, potential client, supplier or other business relation and COMPASS. Employment Agreement at 2.

47. On January 31, 2011, Compass hired Patrick Miller as Vice President of Digital Strategy for the Compass eCommerce team. Miller also accepted and entered into an "Agreement Relating to Employment and Post Employment," which contained the same relevant terms and conditions as those contained in the DiPaula Agreement ("the Miller Agreement").

48. As part of routine employee onboarding, Compass gave each of DiPaula and Miller an Employee Handbook ("the Handbook"). The Handbook also prohibited

> Theft, misappropriation or unauthorized possession or use of property, documents, records or funds belonging to the Company, or any client or employee; removal of same from Company premises without authorization.

> Divulging trade secrets or other confidential business information to any unauthorized persons or to others without an official need to know.

> Obtaining unauthorized confidential information pertaining to clients or employees. Compass Employee Handbook at 12.

49. Miller was especially familiar with the Compass Employee Handbook and the Company's expectations regarding handling of confidential and trade secret information because in his supervisory role, he was tasked with enforcing Handbook policies with subordinates on the eCommerce team.

16

50. In 2012, DiPaula was promoted to Executive Vice President of the eCommerce team.



Compass Marketing Deck, Slide 92. DiPaula (second from the right) and Miller (far left) with the Compass eCommerce Department in 2013

51. Critically, DiPaula and Miller had no prior eCommerce experience. Compass trained DiPaula and Miller on its proprietary marketing protocols it had developed over the prior six years. Compass created these proprietary business methods, processes, and platform communication strategies through years of time, effort, financial investment, and unique access to and analysis of eCommerce data.

52. By 2014, Compass had more than 60 employees in 15 cities in the United States and abroad. Compass also expanded its eCommerce services to support its clients' businesses internationally. It launched services in Canada, the United Kingdom, France, Germany, and Japan. On behalf of Compass, Miller visited Amazon's United Kingdom headquarters. DiPaula and John White visited India with client Proctor & Gamble ("P&G") to explore eCommerce opportunities in India. DiPaula oversaw Compass's efforts to hire a team in and expand into China, including by directing Compass employees to visit Alibaba in China.

17

**III.** *Compass Develops Valuable Trade Secrets and Proprietary Business Know How that Position it for Success*

53.     Before DiPaula and Miller took the helm, the Compass eCommerce team forged relationships with the biggest CPG manufacturers in the world. Compass stood out as a resource for CPG manufacturers because while eCommerce remained a nascent field, access to consumer sales data was extremely limited. It therefore required substantial effort to gain access and unpack the consumer sales data that was instrumental to successfully marketing and selling products on eCommerce platforms.

54.     Access to the Amazon.com platform remains scarce. In its early years, Amazon further limited access to its data. Compass was one of very few companies with a close enough relationship to Amazon suppliers to have been recognized as a certified Amazon partner and to therefore have access to receive real time Amazon consumer search, sales, and supply chain data. Because of Compass's unique and diverse client portfolio, Compass was granted access to Amazon vendor sales data beginning in 2011.

55.     As an Amazon vendor partner, Compass manually pulled Amazon data on behalf of its clients, by logging in with authorization to a restricted Amazon portal known as Amazon Vendor Central. From the inception of Compass's access to Amazon sales data in 2011 until around 2016, software tools were not available to automate review of the data. Compass had to manually download and review client sales information provided in Amazon reports by custom building proprietary formulas into excel spreadsheets.

56.     For more than a decade, Compass exerted significant time, resources, investment, and employee effort to analyze the Amazon sales data and eCommerce algorithms in order to build its proprietary formulas and platform. Its diversified client portfolio allowed Compass to study a high enough volume of client sales reports provided by Amazon to permit Compass the unique

18

ability to understand and discern what pricing, promotions, and search strategies optimized sales and profitability for its clients. Over a long period of time, Compass compiled enough information to understand how Amazon interacted with consumers through promotional tactics to increase or drive those consumers' purchases on Amazon. Compass was specifically able to determine which Amazon promotional vehicles deliver the most value and under what circumstances.

57.    These determinations and data-driven insights enabled Compass to effectively advise clients on the entire Amazon process. Compass understood all aspects of the sales/marketing strategy for CPGs selling to consumers on Amazon, including when products were likely to sell, how to stock inventory by season, how to forecast for upcoming quarters, and how to interact with Amazon on critical supply chain details.

58.    Compass's intricate understanding and years of dedicated research and investment allowed it to build out work product that described the proprietary business methods, processes, and platform communication strategies that were protected as trade secrets.

59.    By 2014, Compass's services to clients were informed by a scientific approach to achieving success for CPGs on the Amazon platform. Compass had dissected the Amazon sales data to look "under the hood" of each Compass client's vendor account at Amazon, as Amazon's algorithms affected all vendor sales dramatically. This unique line of sight into platform minutia allowed Compass to develop and offer clients unparalleled advice and services in the core areas such as search optimization, merchandising, pricing, content, graphic design, and supply chain operations. Each area of service was optimized with Compass's proprietary system.

60.    Compass converted its unique line of sight into the Amazon platform into a significant business opportunity. Prior to the tortious conduct that launched Flywheel, Compass was dominant in the eCommerce marketing space.

61.     The opportunities available to Compass changed drastically, however, when Flywheel arrived on the scene. Flywheel offered and continues to offer identical services as Compass and is Compass's main competitor.

62.     Flywheel's success is no accident. Flywheel offers identical services as Compass to the same market because Flywheel misappropriated the foundational information that Compass compiled for more than a decade to assist clients in navigating eCommerce platforms, especially the Amazon platform.

### IV. *The eCommerce Guide Teaches the Compass Trade Secrets and Compass Implements Reasonable Measures to Protect These Valuable Assets*

63.     In November 2013, at John White's direction and after DiPaula and Miller joined the eCommerce Department, the eCommerce team created the Compass eCommerce Guide ("the eCommerce Guide"). The eCommerce Guide compiled Compass's trade secret, proprietary and confidential Amazon protocols into a step-by-step guide used to train the Compass eCommerce team and execute on Compass's business strategy. The eCommerce Guide memorialized years of research and work that Compass invested to develop its proprietary processes designed to increase and maximize its clients' sales on Amazon and other platforms.

64.     A sampling of representative trade secret categories disclosed or referred to in the eCommerce Guide include:

- Methods Compass has used and on which it continues to rely to interact with the back end of Amazon.com, known as vendorcentral.amazom.com, through its ASIN;

- Processes and communication strategies Compass has used and on which it continues to rely to interact with the back end of Amazon.com to enhance the

visibility of its CPG clients' brands on the Amazon platform, including product positioning in response to user searches;

- Methods and communication strategies Compass has used and on which it continues to rely to interact with the back end of Amazon.com to implement strategic pricing;

- Processes and communication strategies Compass has used and on which it continues to rely to optimize efficiencies for clients in navigating the Amazon supply chain, including processes to ensure on time arrival of products purchased on the Amazon platform;

- Methods Compass has used and on which it continues to rely to generate a "vendor score card" for its CPG clients that positions the products on the Amazon platform for maximum user visibility;

- Methods, protocols, and communication strategies Compass has used and on which it continues to rely to generate pricing values for its CPG clients offering products on the Amazon platform that incorporate past sales activity, cost of goods sold, supply chain costs, and packaging costs into the recommended user-facing pricing values;

- Compilation of protocols to assist CPG clients navigating the competitive eCommerce landscape (*e.g.*, implementing target marketing, predicting user purchasing behavior, pricing products relative to competitors, increasing the rate of conversion, and improving supply chain efficiency);

- Methods and protocols Compass has used and on which it continues to rely to dissect Amazon sales data to generate pricing and forecasting recommendations for its CPG clients;

- Methods and formulas Compass has used and on which it continues to rely to generate a proprietary "Master Client Sheet" for each CPG client to optimize its positioning and sales offerings on the Amazon platform; and

- Formulas Compass has used and on which it continues to rely, including the "base equation," that automatically update data inputs in a client's "Master Client Sheet."

65.     At the time of DiPaula and Miller's original trade secret theft, the representative trade secret categories disclosed or referred to in the eCommerce Guide were maintained in a PowerPoint format that was descriptive of data stored, analyzed, and manipulated in corresponding spreadsheets.

66.     Today, the representative trade secret categories disclosed or referred to in the eCommerce Guide have migrated to an open-source software tool known as the Compass Digital Analytics Program ("CDAP"). CDAP is an application platform for building and managing data applications and training videos in hybrid and multi-cloud environments.

67.     Compass adapted its CDAP to automate the same processes that Compass was undertaking manually at the time of the original trade secret theft by DiPaula and Miller in 2014.

68.     Given the value of the trade secrets within the eCommerce Guide, Compass implemented safeguards to ensure that the information was protected. For example, Compass limited access to only the employees working in Compass's Amazon Division of the eCommerce Department. The Amazon Division never consisted of more than 25 employees. The Amazon Division was housed in a single physical location in Annapolis, Maryland.

22

69. During new employee training for the eCommerce Department, Compass informed each individual that its processes were highly confidential and not to be shared with employees outside the eCommerce Department. New employees were required to complete a course to learn the confidential, proprietary, and trade secret information. Once the new employee completed their training, Compass instructed them that they would be working in a separate branch of Compass. This ensured that the confidential, proprietary, and trade secret information never left the domain of the eCommerce team.

70. Compass kept only one hard-copy version of the eCommerce Guide, which was stored in a single secure room accessible only to the members of the eCommerce Department. Compass restricts access to the room by lock and key. No employee was permitted to remove the eCommerce Guide from the building. Compass has continuously implemented to this day these safeguards to ensure that the information is protected.

71. During the relevant time period, only DiPaula, Miller and individuals on the eCommerce team had an electronic copy of the eCommerce Guide. Access required a username and password.

72. Today, only two Compass employees have access to the CDAP source code that automates the same processes that Compass was undertaking manually at the time of the original trade secret theft by DiPaula and Miller in 2014.

73. Compass did not share and has not shared the trade secrets within the eCommerce Guide or CDAP with its clients, even those clients it advises regarding the Amazon platform.

74. As further outlined in paragraphs 184 through 191, Compass recently discovered that former Compass executives DiPaula and Miller misappropriated the trade secrets described herein in or around September 2014 and used Compass trade secrets to form Flywheel to unfairly

23

compete with Compass. Flywheel's success has been the direct result of its ongoing use of Compass's valuable trade secrets. Ascential is aware of Flywheel's wrongful origins and has taken no steps to mitigate the damage to Compass or otherwise correct the continued trade secret misappropriation and unfair competition. Flywheel and Ascential continue to use Compass's trade secrets and compete with Compass unfairly.

**B. DiPaula & Miller Secretly Found a Competing eCommerce Marketing Company Called Flywheel**

### I. *DiPaula and Miller Leave Compass*

75. In 2014, DiPaula and Miller quit Compass. On September 4, 2014, DiPaula and Miller each sent resignation emails at the same time to John White. In Miller's email, he stated "[t]hank you for the opportunity to start and grow the Compass eCommerce business. I'm proud of what we have built and have lots of great memories of shared success. Like you, I've long wanted to own my own company. To do so, I'm giving you my two weeks' notice and resigning from Compass."

76. Although Compass did not know it at the time, DiPaula and Miller's departure was part of a calculated plan, with surreptitious support by Daniel and Michael White, to start a rival eCommerce company by stealing virtually all of Compass's trade secrets and proprietary business know how and employing it in their new, competing eCommerce company. Thereafter, DiPaula and Miller planned to poach Compass employees who were knowledgeable in these unique eCommerce processes, and pursue virtually all of Compass's clients, which included many of the largest companies in the CPG industry.

77. On September 3, 2014, the day before they resigned from Compass, DiPaula and Miller formed Flywheel Digital LLC ("Flywheel") with the Maryland Secretary of State in furtherance of this plan.

78.     On October 1, 2014, less than one month after their resignation from Compass, DiPaula emailed John White to ask if DiPaula and Miller could purchase the eCommerce Department: "Patrick and I remain interested in the spin-off concept, as we feel vested *in our colleagues we recruited and trained*, and *the clients we have nurtured* these past few years."

79.     In the October 1 email, DiPaula misrepresented the true projected value of Compass's Amazon eCommerce business by stating it would be a "break-even year for the division." DiPaula also failed to include or even note a revenue projection compiled by Miller in November 2013 that forecasted more than $1 billion in sales revenue from Compass's eCommerce customers by 2023.



## Compass Clients @ Amazon

$1,028,304,215

Miller Compass Revenue Projection in 2013.

80.     DiPaula again emailed John White on October 8, 2014, expressing his "disappointment with the pace of [Compass's] response" and "the urgency of completing an agreement quickly," reiterating his and Miller's desire to purchase and own Compass's eCommerce business and all of its associated trade secrets and proprietary information and know

how which, unbeknownst to John White and Compass, DiPaula and Miller had already stolen and were using for Flywheel's benefit to Compass's detriment.

81.    With respect solely to the question concerning whether Compass should seek to enforce the non-competition provisions in the DiPaula Agreement and the Miller Agreement, and with no corresponding knowledge or suspicion that DiPaula and Miller had stolen Compass's trade secrets and proprietary information and know how, John presented the emails to Daniel White, Compass's acting General Counsel, and sought legal advice regarding how the Company should proceed. Daniel advised John White that Compass should not pursue legal action against Flywheel, DiPaula, and/or Miller, and should instead compete with Flywheel in the marketplace, where Compass's trade secrets and proprietary information and know how provided Compass with such a substantial competitive advantage in comparison to a newly formed business like Flywheel without such information. At that time, John White had no reason to question Daniel White's duty of loyalty to Compass, and John followed Daniel's advice.

## II.  *DiPaula and Miller Poach Compass's eCommerce Team*

82.    Following's Daniel's advice, Compass did not bring any legal action against DiPaula, Miller, or Flywheel for the breaches of DiPaula's and Miller's Agreements, and instead worked to compete against Flywheel in the marketplace, leveraging its status as a fixture in the eCommerce industry with over a decade of established client relationships and a dedicated eCommerce department with long-developed and incredibly valuable and protectable intellectual property, whereas Flywheel was a newcomer to the industry with no established clients or personnel or intellectual property of its own.

83.    In October 2016, two years and one month after DiPaula and Miller resigned, there was a mass exodus of Compass's eCommerce Department employees. On October 19, 2016, Justin Liu (eCommerce Account Manager), Andrew Fox (eCommerce Account Manager), and Mike

O'Donnell (eCommerce Strategist) resigned. The next day, on October 20, 2016, Alex McCord (Vice President and Accounts Manager of eCommerce) resigned. Several days later, on October 21, Dayna Acevedo (formerly Dana Bernard) (Chief of Staff) and Mike Menefee (eCommerce Account Executive) resigned. All of these former Compass employees now work at Flywheel.

84.     DiPaula and Miller recruited the Compass eCommerce team to Flywheel with the specific objective of using former Compass employees to unlawfully compete with Compass using Compass's trade secrets and proprietary information and know how, of which each of the outgoing Compass employees had detailed knowledge. On information and belief, DiPaula and Miller recruited these individuals specifically because of their deep knowledge of Compass's trade secrets and proprietary business know how.

85.     The departing Compass employees not only took with them nearly a decade of specialized training in Compass's proprietary eCommerce methods and processes, but, on information and belief, left with electronic or hard copy files that memorialized Compass's trade secret, proprietary, and confidential information regarding maximizing sales on Amazon—the crowning achievement of Compass's eCommerce business.

86.     Rather than compete fairly, DiPaula and Miller have leveraged the collective knowledge of this group of former Compass employees and the trade secrets and proprietary business know how stolen during this exodus to build out Flywheel as a successful enterprise that interferes with Compass business opportunities and poaches its clients.

87.     Flywheel used Compass's trade secrets to specifically target Compass clients that worked with the former Compass employees and has been successful in converting them to Flywheel clients because, by basing Flywheel's services on Compass's stolen trade secrets and proprietary business know how, Flywheel offered and continues to offer identical services as

27

Compass to Compass's former clients. Moreover, by relying on Compass's trade secrets that it misappropriated, Flywheel was able to rapidly accelerate, or avoid altogether, any research and development required to provide these services.

88.     Flywheel's achievements are not a business success story, but rather are attributable to DiPaula and Miller's long-secret scheme to steal Compass's trade secrets and proprietary business know how to unfairly compete with Compass.

89.     Again, John White brought his concerns to Daniel White and asked for legal advice concerning whether Compass could pursue DiPaula, Miller, and Flywheel for non-solicitation issues associated with the 2016 gutting of the eCommerce Department. Once again, Daniel advised Compass against from pursuing legal action, advising that any legal action would require Compass clients to get involved and likely needlessly involve them in litigation. In fact, Daniel told John that Daniel would not participate in any legal action against the former employees, DiPaula, Miller, or Flywheel, and if Compass wished to pursue the claims, it would need to hire outside counsel to do so.

90.     At the time, Compass was unaware of Daniel's involvement in Flywheel, his conflict of interest, or the real reasons (as set forth below) why his legal advice was to not have the Company pursue non-solicitation litigation. As a result, Compass accepted Daniel's legal advice and decided not to pursue non-solicitation legal remedies at that time.

**C.  Compass Opens an Internal Investigation into Michael and Daniel White**

91.     Within days of Compass learning that Flywheel had been sold to Ascential for an amount up to $400 million, a storm began brewing inside the Company that involved Michael and Daniel White.

92.     Compass was organized such that John, Daniel, and Michael chose to oversee separate aspects of Compass. As depicted in the below organizational chart from 2013, John

28

managed sales and ran the Company as CEO. As the only attorney and Certified Public Accountant

("CPA") in the family, Daniel oversaw legal and accounting, and Michael directed operations and

finances. Each brother ran their unit of the business largely independent from one another. While

John served as Compass CEO for the longest period, he did not supervise the day-to-day operations

that he entrusted to and that fell under Daniel's and Michael's purviews.



Compass Marketing Deck, Slide 4. 2014 Compass organization chart (DiPaula and Miller circled in red; Michael, Daniel, and George circled in yellow; and the Compass employees poached by Flywheel are circled in green – note Mike O'Donnell and Justin Liu do not appear on the chart).

93.     As Vice President of Operations and Comptroller of Compass, Michael was the

sole administrator of Compass's payroll and served as the sole trustee of the company's 401(k)

plan. His responsibilities included overseeing the bookkeeping and financial accounts. Michael

also worked with Daniel and an outside CPA to prepare and file Compass's annual income tax

returns. Accordingly, Daniel and Michael each owed a fiduciary duty to Compass.

94.     On October 25, 2018, only five days before the November 1, 2018 publicly

announced sale of Flywheel to Ascential, Michael White sent out a company-wide e-mail

29

disparaging John White, and suggesting that the Compass Board of Directors and others would be meeting soon to address issues. On November 20 and 21, 2018, Michael White and DiPaula exchanged phone calls with one another. On November 23, 2018, John White fired Daniel and Michael, though each remained on the Compass Board of Directors and each maintained a minority ownership interest in Compass.

95.     On February 14, 2019, the Compass Board of Directors held a special meeting and removed Daniel and Michael from the Board. They were replaced by Jerry Cain and Todd Mitchell.

96.     After the termination and removal, Compass hired criminal investigator Ron Bateman ("Bateman") to investigate Daniel's and Michael's conduct as Compass officers. Compass also hired Luis Fernandez ("Fernandez"), a certified forensic fraud examiner as its new Controller. As part of his onboarding, Fernandez examined Compass's books and records.

97.     The investigation and examination uncovered 14 years of substantial mail and wire fraud, money laundering, embezzlement, and attempted extortion perpetrated by Daniel and Michael.

98.     It is clear from the schemes discovered and detailed below that Daniel and Michael exploited Compass and used Company funds to finance a life of luxury for themselves and their immediate family members. Daniel and Michael repeatedly violated their fiduciary duties to Compass and elevated their own wants and conveniences above what was in the best interest of Compass, its clients, and its many employees. After Compass removed Daniel and Michael as directors and employees, Daniel and Michael orchestrated a far-reaching cover up of their wrongdoing, and they set out on a revenge campaign intended to destroy the Company and punish their brother John for removing them from Compass.

I.  *The Secret Compass Bank Account Scheme (Money Laundering, Embezzlement, Mail Fraud & Wire Fraud)*

99.     On or about December 1, 2008, Michael and Daniel opened a checking account in Compass's name at Community Bank of the Chesapeake (formerly County First Bank) ("Community Bank"). Michael and Daniel were and remain the only authorized signatories on the checking account.

100.     On or about June 15, 2009, Michael opened a savings account in Compass's name at Community Bank. Michael White was the only authorized signatory on the savings account.

101.     The address associated with both Community Bank accounts ("the Secret Bank Accounts") is Michael's home address.

102.     These Secret Bank Accounts were created without Compass's knowledge or approval.

103.     Daniel and Michael White improperly deposited Compass client checks into the Secret Bank Accounts and then used the funds for personal gain.

104.     From 2008 to 2020, Michael and Daniel White used these Secret Bank Accounts to financially benefit themselves, their wives Debra White ("Debra") and Kelly White ("Kelly"), and corporations they owned or operated, including W-7 Enterprises LLC, Woodville Pines LLC, Leonardtown Investments LLC, Compass Limousines LLC, Spinnaker Group LLC, and Compass Foundation LLC.

105.     For example, the Secret Bank Accounts were used to make monthly payments on life insurance policies held by Michael and Daniel; pay money to Michael's unrelated gambling business; and initiate a $200,000 wire transfer to the Washington Football Team (now the Washington Commanders).

106. To date, disbursements from the Secret Bank Accounts show that more than $3.4 million was disbursed to Michael, and more than $632,000 was disbursed to Daniel. In just the four months between January and April of 2019, Daniel and Michael withdrew at least $370,000 from the Secret Bank Accounts via checks written to themselves.

107. Upon information and belief, around the time that Compass terminated Michael and Daniel's employment, they drained the Secret Bank Accounts. Each of these actions also were a breach of fiduciary duty to Compass.

## II. *The Ghost Employee Scheme (Embezzlement)*

108. Daniel and Michael added their family members Debra, Kelly, and Emile White ("Emile") to the Compass payroll and benefits programs even though Debra, Kelly, and Emile were never Compass employees.

109. In or around 1998, Daniel and Michael added Debra (Michael's wife) to the payroll without Compass's knowledge or approval.

110. Prior to April 1, 2010, Daniel and Michael added Kelly (Daniel's wife) to the payroll without Compass's knowledge or approval.

111. In August of 2017, Daniel and Michael added Emile (Daniel's daughter) to the Compass payroll without Compass's knowledge or approval.

112. In or around 2015, Daniel and Michael added Julie White (Daniel's colleague with no familial relation) as an employee without Compass's knowledge or approval.

113. From 2010 to 2019, Kelly received biweekly direct deposits from Compass into an account she maintained at Capital One.

114. From 2013 to 2019, Debra received biweekly payroll direct deposits from Compass into an account she maintained at M&T Bank.

115. From 2017 to 2019, Emile received biweekly payroll direct deposits from Compass.

32

116.     From 2014 to 2016, Julie received more than $3,600 in gifts and compensation from Compass.

117.     Michael and Daniel also caused Kelly and Debra to enroll in the company's 401(k) retirement plan, whereby portions of Kelly and Debra's "salaries" and matching contributions from Compass were deposited into accounts in each of their names.

118.     From 1998 to 2019, Michael intentionally covered up these ghost employees in the Compass payroll system by creating fictitious spreadsheets and reports to provide to corporate leadership instead of running payroll reports through Compass's third-party payroll provider portal Paychex. Michael's falsified records prevented Compass from discovering the ghost employee scheme until Compass later initiated an investigation following the removal of Daniel and Michael from their roles at Compass.

### III. *The IRS Tax Check Scheme (Embezzlement)*

119.     Michael created a tax check scheme that allowed him and Daniel to have money embezzled from Compass be rebated back from and through the Internal Revenue Service ("IRS") ("IRS Tax Check Scheme").

120.     Michael created the IRS Tax Check Scheme whereby he would issue additional electronic payroll payments to himself and various employees that he coded as "tax checks." These payments were in addition to normal payroll payments, but were very large, were designated as 100% tax withholding, and would go to the IRS and to the state of Maryland.

121.     Michael exclusively controlled on whose behalf the IRS received additional payments, as well as the payment frequency and magnitude.

122.     For example, in 2015, Michael processed $520,000 in 100% tax withholding payments to himself and $530,000 to Daniel.

33

123. In 2018, Michael processed $270,000 in 100% tax withholding payments to himself, and $230,000 to Daniel.

124. Daniel and Michael also used the IRS Tax Check Scheme to benefit their families. In 2017, Michael processed $20,000 in 100% tax withholding payments for Debra and another $20,000 for Kelly, although neither was ever employed by Compass.

125. As a result of the IRS Tax Check Scheme, Michael and Daniel knowingly funneled money through the IRS through payroll disbursements that far exceeded their normal federal payroll tax withholdings to obtain large refunds, thereby embezzling millions of dollars from Compass.

## IV. *The Shareholder Loan Scheme (Embezzlement)*

126. Michael caused Compass to issue payments to himself and Daniel purportedly as reimbursement for personal loans that were never made to the company. Michael then caused Compass to issue payments to himself and Daniel purporting to be principal and interest payments against the fake loans ("the Shareholder Loan Scheme"), in violation of their fiduciary duties to Compass.

127. On or about June 7, 2015, Daniel received a check from Compass for $100,000 with "LTC" written on the memo line. Upon information and belief, "LTC" stands for loan to company.

128. On or about May 19, 2016, Daniel received a check from Compass for $70,000 with "LTC" written on the memo line.

129. On or about January 24, 2019, Daniel received a check from Compass for $50,000 with "LTC" written on the memo line.

130. On or about June 5, 2015, Michael received a check for $200,000 with "LTC" written on the memo line.

34

131. On or about October 15, 2015, Michael received two checks for $100,000 each with "LTC" written on the memo line.

132. On or about February 9, 2016, Michael received a check for $450,000 with "LTC" written on the memo line.

133. On or about March 1, 2016, Michael received a check for $450,000 with "LTC" written on the memo line.

134. On or about June 17, 2016, Michael received a check for $50,000 with "LTC" written on the memo line.

135. On or about June 29, 2016, Michael received a check for $100,000 with "LTC" written on the memo line.

136. On or about November 12, 2016, Michael received a check for $300,000 with "LTC" written on the memo line.

137. On or about June 14, 2018, Michael received a check for $100,000 with "LTC" written on the memo line.

138. On or about February 12, 2019, Michael received a check for $200,000 with "LTC" written on the memo line.

139. On or about April 2, 2014, Daniel received a check for $62,451.87 with "2013 loan to company interest" in the memo line.

140. On or about February 18, 2015, Michael received a check for $90,235.89 with "2014 Interest on K1 Loans to Company 9%" in the memo line and Daniel received a check for $91,107 with "state taxes 2014 interest on K1 loans to company" in the memo line.

141.    On or about April 11, 2016, Daniel received a check for $55,459.48 with "2015 Interest Payment" in the memo line and Michael received a check for $71,865.89 with "2015 Interest Payment" in the memo line.

142.    In an e-mail dated August 21, 2017 that Compass recently discovered in connection with its internal investigation into this wrongdoing, Daniel White wrote the following to Michael White regarding setting up Emile White as a ghost employee: "Anything she makes can come out of my BS loan."

143.    Michael and Daniel continued to use Compass funds from the secret Compass bank account they controlled to repay their fake loans even after they were fired and removed as Compass directors. Each of these actions also were a breach of fiduciary duty to Compass.

**V.** *Information Technology Lockout of Compass Business Records and Accounts (Attempted Extortion)*

144.    George White ("George") is Michael's son. Prior to May 2019, George was the IT Administrator at Compass while at the same time working full time as a Maryland State Trooper. In this role at Compass, George had administrator access to Compass's GSuite email, Microsoft, and QuickBooks accounts.

145.    Specifically, George controlled the Compass domain, including credentials and access to Compass Networking Administrator Credential login password and user ID; Compass servers, switches, and wireless access points; NAS (Synology, etc.); Firewall-Cisco ASA; Compass Marketing Routers; all Compass printers; all Compass phone systems; and Network Solutions Account for Compass's Domain Name Registrar. George had the ability to change all of the above business records and accounts via his administrator access.

146.    On or about April 29, 2019, after Daniel and Michael were voted off the Board of Directors, George had reason to believe that his removal was also imminent. George attempted to

36

leverage his control over the Compass IT systems to extort additional payments for himself prior to his departure. Specifically, George demanded that Compass give him a promotion including a $100,000 signing bonus with a new title, a base salary of $225,000 with stepped raises quickly increasing the salary to $297,000, and a severance package guaranteeing a full year base salary in the event his employment was terminated.

147.    When Compass refused, George resigned.

148.    On or about April 30, 2019, a company hard drive and laptop assigned to George was stolen. On information and belief, George took his company hard drive and laptop with him upon resigning from Compass so that he could continue to maintain control over Compass IT systems.

149.    Sometime after April 30, 2019, George intentionally and maliciously cut off Compass access to employee email accounts with the compassmarketinginc.com domain, Microsoft, QuickBooks, and other business records and accounts ("the July Extortion Attempt").

150.    Ever since, Compass has attempted to regain control of its books and records, with limited success.

151.    To this day, Compass remains locked out of its own compassmarketinginc.com domain. Compass does not have access to any of the employee email accounts or other business records maintained on QuickBooks that were maintained within the compassmarketinginc.com domain. Consequently, the Compass sales force was not able to communicate by email with clients or otherwise access the records required to do business. Compass had no choice but to start over with its IT infrastructure and establish a new compassmarketinginc.net domain at significant expense.

37

152.    A further consequence of the IT lockout and the Company's continued inability to access the compassmarketinginc.com domain is that evidence for this lawsuit and others cannot be preserved. For example, evidence of wrongdoing by Daniel or Michael and evidence of misappropriation of trade secrets and other proprietary business know how by DiPaula and Miller almost certainly resides on the compassmarketinginc.com domain. That evidence is no longer within Compass's control. That evidence could not aid its internal investigations and cannot be relied on for purposes of litigation. Moreover, even if access to the compassmarketinginc.com domain was somehow recovered pursuant to court order, it is likely that George, Michael, and whoever else has access to the domain has destroyed relevant evidence to cover up past wrongdoing.

153.    Because Compass has been unable to determine the full extent of the harms incurred in relation to the IT lockout in 2019, it has been unable to meaningfully assess whether the IT lockout was a further effort to misappropriate trade secrets and other proprietary business know how residing in Compass's electronic files. Compass has reason to believe that the IT lockout coincided with additional misuse of its proprietary information, including valuable trade secret information.

154.    The July Extortion Attempt and subsequent IT lockout substantially impacted Compass. It strained client relationships due to lost research and development, reports, sales, and account data. The July Extortion Attempt also impeded Compass's ability to file its income tax returns in 2019.

155.    To repair the situation, Compass expended significant effort, time, and money to create new accounts and business records. Compass employees engaged in the timely task of

38

reaching out to clients and leads to address problems arising from missing records and provide new contact information.

156.   Today, George and Michael maintain dominion and control over the lost accounts and business records. A third-party service provider was able to give Compass access to all incoming (but not ongoing) messages for its old domain. Each month, Compass receives a Google invoice to George White at Compass Marketing for the domain name compassmarketnginc.com and an email from Google Payments to Michael White for the domain name compassmarketnginc.com.

157.   In October 2021, Compass received an email from Google Invoice which showed that the number of individual email addresses under the compassmarketnginc.com domain was decreased from 79 to 60. This decrease in individual email addresses raises concern for Compass that the actors in control of the domain have already engaged in spoliation.

## VI. *Sham Legal Campaign*

158.   After Compass fired Michael and Daniel and the Board removed them as directors, Michael and Daniel attempted to cover up their illicit conduct by filing a regulatory complaint and a lawsuit to dissolve Compass in its entirety.

159.   On or about October 8, 2019, Daniel sent letters to the General Counsel of Principal Financial Group (Compass's 401(k) plan administrator) and to the United States Department of Labor ("DOL") falsely representing that he was the trustee for Compass's 401(k) plan. Daniel claimed that then Compass President Todd Mitchell embezzled funds.

160.   Principal Financial Group ("Principal") performed an investigation and concluded that Daniel was not the trustee and there were no improprieties with Compass's 401(k) plan.

161.   DOL's investigation is ongoing. As a result of Daniel's false allegations, Compass is incurring substantial legal fees as it cooperates with the DOL investigation.

39

162.    On or about December 2, 2019, Michael and Daniel filed a lawsuit against Compass in the Commonwealth of Virginia: *White et al. v. Compass Marketing, Inc. et al.*, Case No. CL19003628-00 (the "Virginia Lawsuit"). The Virginia Lawsuit sought judicial dissolution of Compass claiming, among other things, that the owners are deadlocked on management of the company.

163.    Through false representations, the Virginia Lawsuit sought to transfer control of Compass from John as retribution for removing Michael and Daniel from their roles at Compass.

164.    On or about April 2, 2021, Daniel and Michael abruptly non-suited the case after the Virginia court granted a motion to compel that required Daniel and Michael to produce documents, answer interrogatories, and appear for depositions.

**VII.** *Anonymous Campaign Against Compass (Mail and Wire Fraud)*

165.    From October 2019 to present, an anonymous author has sent letters using the United States mail service and email across state lines to individuals, companies, and the government to damage Compass's reputation.

166.    On or about October 16, 2019, an anonymous letter was mailed to Compass client Colgate Company ("Colgate"). As a result, Colgate pulled out of a Compass pilot program related to direct-to-consumer marketing.

167.    Similar letters were mailed to Compass clients Johnson & Johnson, Duracell, and Bush's Beans.

168.    A series of emails from www.protonmail.com ("Protonmail") were sent to Compass client Duracell and potential client, Microsoft. Protonmail is an email service that houses its servers in Switzerland so that Swiss privacy laws protect the user's identity. Protonmail does not have Internet Protocol Address logs, so the user's identity is untraceable.

169. Daniel White purchased an annual subscription for a Protonmail account and paid for it with his Compass American Express credit card.

170. This anonymous campaign has severely damaged Compass's reputation and interfered with ongoing and potential business relationships.

**VIII.** *Personal Use of Compass Corporate Credit Cards (Embezzlement)*

171. Michael and Daniel used Compass corporate credit cards to charge personal expenses to Compass.

172. Compass issues American Express Blue Business Plus credit cards ("AmEx Blue") to its employees. Each employee's AmEx Blue card is integrated with a platform called Expensables. Every charge made on an AmEx Blue card is automatically logged to the appropriate employee's Expensables registry.

173. Compass uses Expensables to review, approve, and categorize charges. Compass entrusted Michael with reviewing and approving the Expensables reports each month.

174. In or around February 2012, the link between Daniel's AmEx Blue card and Expensables was terminated, and his charges were not visible to Compass.

175. Between 2012 and 2017, Daniel's expense reports were submitted to Michael in batches that listed nothing more than a total dollar figure and the description "personal expenses."

176. Daniel's expenses included tuition for his three children to attend a private high school; purchases related to his coin collecting hobby; an annual subscription to a Switzerland based Proton email account; and vacations for Julie White.

177. Between 2013 and 2019, Daniel incurred more than $950,000 in personal charges on the AmEx Blue card. Daniel intentionally failed to reimburse Compass for any of these personal expenditures.

178.    Prior to 2012, Michael opened an American Express Business Green Rewards Card ("AmEx Green") in the Compass account. Michael did not link the AmEx Green card to the Expensables platform and the charges were not visible to Compass.

179.    The AmEx Green Card was obtained without Compass's knowledge or approval.

180.    The personal expenses Michael charged to the AmEx Green Card included purchases with the Washington Football Team (now the Washington Commanders) and vacations and flights for friends and family.

181.    Between 2012 and 2019, Michael incurred more than $980,000 in personal charges on the AmEx Green card. Michael intentionally failed to reimburse Compass for any of these personal expenditures.

182.    Importantly, the financial records show that Daniel and Michael continued to charge personal expenses to Compass after the date they were fired and removed from the Board.

**D.  Compass Discovers Miller, DiPaula, and Flywheel's Trade Secret Theft**

183.    As set forth in more detail in paragraphs 202 through 208 of this Complaint, Compass later discovered the connection between the extensive wrongdoing by Daniel, Michael and George White set forth above, and the theft of Compass's trade secrets and proprietary information and know how by Flywheel, DiPaula, Miller.

184.    On or about January 20, 2020, while performing a review, Compass Controller Luis Fernandez discovered an article written by Miller entitled "The Future of Amazon Fresh?"[1] dated August 25, 2015. The last line of the article stated that "Patrick Miller, Co-Founder, Flywheel Digital spent the last four years deconstructing eCommerce sites and helping American

---

[1] https://www.profitero.com/2015/08/the-future-of-amazon-fresh/

42

manufacturers figure out Amazon from a brand, search, social, customer service, supply chain, pricing and sales perspective."

185.   From August 25, 2015, "the last four years" encompass the period from August 25, 2011, to August 25, 2015. Miller was employed with Compass from February 1, 2011, to September 4, 2014—meaning that all but 11 months of that period were during his Compass employment.

186.   Fernandez engaged in further research and located a Flywheel-branded Power Point presentation and voiceover that Miller gave at the Online & Digital Grocery Summit USA on November 5, 2015 ("the Digital Grocery Presentation"). Miller's introduction included a review of his clients: P&G, J&J, Mars, McCormick, Ferrero, 5 Hour Energy, and Colgate. All of of these companies were Compass clients or former Compass clients.



Discovering how Amazon is a Brand, Social and Search Platform
Patrick Miller, *Co-Founder,* **Flywheel Digital**

3. FlyWheel Digital.pptx

Unknown Track - Unknown Artist    00:00 / 00:00

Screenshot from Digital Grocers Summit USA Website. Available at: https://www.digitalgrocerysummit.com/presentations.

187.   Fernandez gave the article and the Digital Grocery Presentation to John White, who (i) immediately recognized the clients Miller claimed were Flywheel clients as Compass's clients, and (ii) further recognized the contents of the Digital Grocery Presentation as content that could only have been generated with knowledge of Compass's trade secret information and proprietary business know how. The Digital Grocery Presentation revealed that Flywheel, DiPaula, and Miller were in possession of the more comprehensive repository of Compass trade secrets, the eCommerce Guide. The Digital Grocery Presentation included key pieces of information that could only be known from the original Compass eCommerce Guide.

188.    For example, the Digital Grocery Presentation provided information concerning Compass's general strategy to prioritize customer search results on Amazon. Even more significantly, the Digital Grocery Presentation represented an approach to selling clients' products through Amazon that precisely mirrors the Compass approach and could only be accomplished with possession of the eCommerce Guide.

189.    As previously outlined, Compass maintained only a single printed version of the eCommerce Guide as part of the protocol to maintain its confidentiality. However, while at Compass, Miller had access to the electronic version. Upon information and belief, Miller misappropriated the electronic version of the Compass eCommerce Guide, then he and DiPaula used it to develop the Flywheel business model. Based on Flywheel's own description of its business on the Flywheel website, that use of the misappropriated Compass information continues today:

> **WE ACCELERATE WORLDWIDE BRAND GROWTH IN DIGITAL RETAIL**
>
> As an early leader in Amazon Advertising, and certified partner, our massive scale allows us to cull insights to better inform our technology and client brand strategy, creating additional value and superior results.
>
> Our team of account managers, search specialists, analysts, data scientists, and software developers work together to help brands come to life across digital retailers and execute so customers convert. We love the hard questions and want the clients that dig in to understand this massive opportunity.

Flywheel Website: Who We Are Page. Available at: https://www.flywheeldigital.com/who-we-are/ 2/7/22.

44



**amazon**advertising

As an early leader in Amazon Advertising, our massive scale allows us to cull insights to better inform our technology and our client's brand strategy, creating additional value and superior results. We believe the first dollar should be spent on search, but once you max out on sponsored ads, Amazon's programmatic display and video ad buying platform is where you should focus next to drive sales online and off. In addition to managing media efficiencies, we have created a series of ensemble models to forecast business growth down to an ASIN so you have better visibility to what Amazon will order.

Flywheel Website: Retail Platforms. Available at https://www.flywheeldigital.com/retail-platforms/ 2/7/22.

190. The metadata for the Digital Grocery Presentation is prima facie evidence of misappropriation in 2014 around the time that DiPaula and Miller launched Flywheel and then left Compass. The metadata indicates that the Digital Grocery Presentation was created on November 12, 2013, while Miller and DiPaula were still at Compass. Then, on November 4, 2015, one day before the Online & Digital Grocery Summit, Miller updated the file, presumably to reflect Flywheel branding and to remove the original Compass-branding.

191. It was not until January 20, 2020, that Compass discovered this prima facie evidence of Flywheel's misappropriation activities. Given the contents of the Digital Grocery Presentation, which was copied from Compass's files, there is every reason to believe that the eCommerce Guide was also copied or otherwise exported to Flywheel by DiPaula and/or Miller. This information was not known to Compass and could not reasonably have been known because DiPaula and Miller had acted in secret and concealed the existence of the misappropriation.

192.   After Compass discovered the stolen trade secrets, it investigated whether any of the clients that left Compass since 2014 subsequently engaged Flywheel for identical eCommerce services.

193.   On information and belief, using Compass's trade secrets, Flywheel has poached a long list of Compass eCommerce clients, including well-established brands such as P&G, Allergan, Amplify Snacks Brands, Colgate, Ferrero, Johnson & Johnson, Mars, McCormick, Old Wisconsin, and 5 Hour Energy.

194.   Before their resignations, DiPaula, Miller, Alex McCord ("McCord") (then-Vice President of eCommerce at Compass, and now an Executive Vice President at Flywheel), and another Compass employee had been interviewing with P&G for a specific eCommerce engagement. P&G was a long-time Compass client that used Compass's traditional marketing services.

195.   Before their resignations, DiPaula and Miller, along with McCord, pitched P&G (led by Miller) to expand the relationship, which P&G expressed interest in doing.

196.   Shortly after DiPaula and Miller left Compass, however, P&G representatives became unresponsive to Compass's outreach, at that point led by McCord.  McCord recommended that Compass no longer pursue the expansion of the P&G relationship into the eCommerce space.

197.   On information and belief, DiPaula and Miller falsely told P&G representatives that Compass was exiting the eCommerce business, and that was Flywheel was being set up to service the P&G account. Upon information and belief, DiPaula told multiple Compass employees that Flywheel would not be competing with Compass in any respect. P&G terminated its engagement with Compass shortly thereafter, and upon information and belief, contracted with Flywheel for eCommerce service.

46

198.    Upon information and belief, after duping P&G into believing that Compass was exiting the eCommerce space and secretly luring away the P&G account, Flywheel, at DiPaula and Miller's direction, assigned a student from the University of Maryland, Shiwen Xu ("Xu"), to lead Flywheel's analytics group using Compass's stolen trade secrets, and to specifically manage analytics reporting for Flywheel's P&G account. Xu also became the registered agent for Flywheel in California, and the only other Director/Officer besides DiPaula listed on the Flywheel's California Board of Directors in 2017.

199.    Today, both Flywheel and Ascential publicly tout their client relationship with P&G. For example, Miller referenced P&G as a client in a June 2020 media interview.[2]

200.    Flywheel, Miller, DiPaula have intentionally impeded Compass's business opportunities with P&G and other Compass clients, directly and indirectly. Because of their ongoing efforts to conceal their misconduct, Compass has only recently discovered some of these material facts, and in connection with its investigation into wrongdoing, has documented evidence of such efforts.

201.    Flywheel, Miller, and DiPaula were only in a position to pursue Compass's employees and clients because they founded a company built on misappropriation of Compass's trade secrets and proprietary business know how, and future strategic plans. Because of this misappropriation and interference, Flywheel has been unfairly competing with, and continue to unfairly compete with, Compass. Further, because of this misappropriation and interference, Flywheel, Miller, and DiPaula have profited from, and continue to profit from, Compass's investment in its eCommerce capabilities. Compass brings this lawsuit to hold these actors accountable for the harms this conduct has inflicted on Compass.

---

[2] https://www.alistdaily.com/media/warc-effectiveness-in-ecommerce-lions-live/.

**E. Compass Discovers Michael and Daniel White are Connected to Miller, DiPaula, and Flywheel's Trade Secret Theft**

202. A Compass auditor on the internal investigation team discovered multiple checks issued from Daniel White's personal account to Chip DiPaula. These checks were the start of a trail that led Compass to recently discovery that Michael and Daniel White are part of the conspiracy by DiPaula and Miller to found and operate Flywheel as a competitor of Compass's using Compass's stolen trade secrets and proprietary information and know how.

203. On October 14, 2015, more than 13 months after DiPaula resigned from Compass, Daniel had M&T Bank issue a cashier's check for $10,000 to DiPaula, using Daniel's personal funds.

204. On December 1, 2015, nearly 15 months after DiPaula and Miller resigned from Compass, Michael White secretly issued to Daniel White a check from Compass's M&T bank account for $65,000. The memo portion of the check read "Final Payments to James DiPaula and Patrick Miller."

205. Eight days later, on December 9, 2015, Daniel had M&T Bank issue another cashiers check for $25,000 to DiPaula, using Daniel's personal funds.

206. Compass did not owe any severance to DiPaula or Miller, either upon their voluntary resignations in September 2014, in October and December of 2015, or at any other time. In any event, the "severance payment scheme" was false, and any such purported payments to DiPaula and Miller, whether from Compass's M&T Bank account or from Daniel White's personal M&T Bank account, was in violation of Compass policies.

49

207.   Upon information and belief, Daniel provided the funds set forth in paragraphs 202 through 206 to DiPaula and Miller to support their funding and operation of Flywheel.

208.   Upon information and belief, Daniel and Michael knew and encouraged DiPaula and Miller's theft of Compass trade secrets, and wanted Flywheel to succeed to the detriment of Compass. Moreover, Daniel's involvement with and interest in Flywheel created a conflict of interest for him while he was serving as General Counsel for Compass, which he failed to disclose to Compass in violation of his duties thereto.

## F.  Ascential's Role as a Co-Conspirator in Flywheel's Misappropriation of Compass's Trade Secrets

209.   On or about November 2, 2018, four years after Flywheel was founded, Ascential, a London-based global specialist information company, acquired Flywheel for the purchase price of approximately $400 million, with an initial payment of $60 million and $340 million of contingent earn out payments over the following three years in the event certain milestone and performance metrics were achieved.

210.   Flywheel has re-branded itself as an "Ascential Company," as seen on the home page of the Flywheel website[3]:



---

[3] https://www.flywheeldigital.com/

211.    The Ascential press release that announced the acquisition defined the Flywheel business model as "a provider of managed services to consumer product companies trading on Amazon."[4]  Ascential also stated that "Flywheel offers customers Amazon-specific software, tools and expertise to drive sales and brand performance across Amazon platforms by directly actioning solutions for clients."

212.    Ascential's subsequent 2021 Interim Report noted Flywheel's astounding growth. In 2016, Flywheel operated in one marketplace in one country. By 2020, Flywheel was operating in 60 marketplaces in 14 countries.

## I. *Ascential Receives Notice of the Flywheel's Improper Origins and Opts to Perpetuate the Harms Against Compass*

213.    Upon realizing the misappropriation, interference, and unfair competition that is ongoing, Compass sought to engage with Ascential, as Flywheel's parent company, with the goal of working through Ascential to remediate past harms. Compass compiled known facts of Flywheel's misappropriation and other misdeeds as of May 2021 and contacted Duncan Painter, the Ascential CEO, and Scott Forbes, the Chair of Ascential's Board, to initiate what Compass hoped would be productive settlement discussions.

214.    Jeff Moorad, acting as an advisor to Compass and a long-time friend of John White, first initiated contact with Duncan Painter, Ascential's CEO, on May 9, 2021, to discuss, among other things, Ascential's acquisition of Flywheel and inform him of Compass's contention that Flywheel stole and continued to use Compass's trade secrets and proprietary information and know how. After receiving no response, Mr. Moorad contacted Scott Forbes, the Chairman of Ascential's Board of Directors, on May 17, 2021.

---

[4] https://www.ascential.com/sites/default/files/content-files/press-releases/acquisition-of-flywheel-digital-01-11-18.pdf

51

215. Mr. Forbes accommodated Mr. Moorad's request for a meeting, and they met over lunch on May 24, 2021 at the Four Seasons Park Lane in London. During that lunch meeting, Mr. Moorad communicated Compass's concerns relating to Flywheel's pre-acquisition conduct, including its investigation that discovered extensive evidence of Flywheel's use of Compass's misappropriated trade secrets and proprietary information and know how. Mr. Moorad advised Mr. Forbes of Compass's desire to engage in direct discussions with Ascential to find a business solution short of contentious, public, and long-tail litigation that would ensue to remedy the substantial harm inflicted upon Compass by Flywheel, DiPaula, Miller and others.

216. On May 26, 2021, Mr. Forbes wrote to Mr. Moorad to confirm that Compass's concerns and desire for a business resolution had been communicated to Ascential: "I just want to acknowledge that as promised, I communicated your messages promptly to Ascential on Monday."

217. Thereafter, Mr. Moorad responded to Mr. Forbes: "Specific to the Ascential/Compass part of our discussion, as mentioned, I'd be happy to share additional details around the situation and explore ways to work together to find a business solution - if Ascential is interested in this approach, I'm happy to facilitate discussions - I know you mentioned that you'd reach back out and I'll wait on your timing - if there is a way to manage reputational risk and shareholder value for both companies, that would be a win/win result."

218. Mr. Moorad followed up with Mr. Forbes on June 5, 2021, and on June 7, 2021, Mr. Moorad and Mr. Forbes spoke briefly by phone to discuss the Compass/Flywheel situation.

219. On June 24, 2021, Mr. Moorad emailed Mr. Forbes, and Mr. Forbes responded that day, noting that he would pass Mr. Moorad's note "along to the lawyers."

220. On July 1, 2021, Mr. Moorad emailed Mr. Forbes to update him on issues that were arising between Compass and Flywheel. According to Mr. Moorad's email, Dayna Acevedo (former Compass Chief of Staff and current Flywheel Vice President of People & Digital Commerce) held a meeting in her home on or about June 24, 2021, where she questioned a Compass employee about the lunch and discussion between Mr. Moorad and Mr. Forbes. Mr. Moorad again relayed in this email Compass's concerns about Ascential's due diligence failures in acquiring Flywheel, including that DiPaula had incorporated Flywheel while still an employee at Compass and that Acevedo was a managing director of Flywheel. Mr. Moorad closed the email by noting his hopefulness that a resolution could be reached without resorting to litigation.

221. In response, on July 5, 2021, at attorney from Fried, Frank, Harris, Shriver & Jacobson LLP, who represents Ascential, emailed Mr. Moorad and asked him to "discontinue all communications with Mr. Forbes regarding these matters."

222. On October 7, 2021, Compass sent a formal cease and desist communication to Ascential and Flywheel.

223. Since May 2021, and certainly by no later than early July 2021, Ascential has been fully on notice of Compass's claims of misappropriation of Compass's trade secrets and proprietary information and know how by Flywheel, DiPaula, and Miller. Notwithstanding this notice, Ascential has chosen to allow the harms to continue and to escalate, continuing to profit from same as the parent company of Flywheel. Ascential's endorsement of and continued facilitation of Flywheel's wrongful conduct renders Ascential a participant in the ongoing misappropriation and unfair competition, as well as an active participant in the ongoing conspiracy pled in this Complaint.

**COUNT I – DEFEND TRADE SECRETS ACT OF 2016 (DTSA)**
**(Flywheel, DiPaula, Miller, and Ascential)**

**– and –**

**COUNT II MARYLAND UNIFORM TRADE SECRETS ACT (MUTSA)**
**(Flywheel, DiPaula, Miller, and Ascential)[5]**

224.    Compass incorporates the prior paragraphs as if fully set forth herein.

225.    Compass is the owner of trade secrets that were accessed by DiPaula and Miller by virtue of their employment with Compass's eCommerce team.

226.    Compass is also the owner of trade secrets that were misappropriated during the course of the 2019 IT lockout or other points when certain of the Defendants, as pleaded above, accessed, acquired, used and/or disclosed Compass property following DiPaula and Miller's departure from Compass.

227.    The representative categories of trade secrets identified in the factual background at paragraph 64 are owned by Compass and constitute trade secrets within the meaning of 18 U.S.C. § 1839 and the Maryland Uniform Trade Secrets Act ("MUTSA").

228.    Flywheel is headquartered in Maryland, but operates in other states, and regularly transacts business in states other than Maryland, including in person and by phone, internet, and mail. Compass's misappropriated trade secrets relate to Flywheel's business operations and are used by Flywheel in interstate commerce. In particular, Flywheel and Ascential have used and continue to use the misappropriated Compass trade secrets, which include, among other categories, formulas, marketing, pricing, sales, and business information, in interstate commerce by soliciting business across state lines.

---

[5] The same set of allegations underlie two separate counts for trade secret misappropriation under the Defend Trade Secrets Act and the Maryland Uniform Trade Secrets Act.

229.    Notably, the trade secrets misappropriated by Flywheel, DiPaula, Miller, and Ascential are related to services that are used and/or intended to be used in interstate commerce, as Compass and Flywheel both use the trade secrets to maximize supplier sales on Amazon, which sells consumer products worldwide and to all fifty states.

230.    Compass has taken reasonable measures under the circumstances to protect its trade secrets, including, but not limited to, by limiting access to the eCommerce Guide to only members of the eCommerce team with whom Compass had confidentiality agreements, maintaining only one physical copy of the eCommerce guide kept in a monitored location with limited access, limiting electronic access to the eCommerce guide through password protection, and only allowing select eCommerce team members to maintain and access the eCommerce Guide.

231.    As a result of the above-mentioned protective measures, the trade secrets at issue in this matter are not generally known or readily available to the public or Compass's competitors.

232.    Alternatively, to the extent that the trade secrets at issue in this matter are now generally known or readily available to the public or Compass's competitors due to the misappropriation and subsequent disclosure by Flywheel, DiPaula, Miller, and Ascential, at the time of misappropriation, the trade secrets were not generally known or readily available to the public or Compass's competitors. Any such unauthorized disclosures of Compass's trade secrets by Flywheel, DiPaula, Miller, and Ascential, were separate acts of misappropriation. Moreover, at the time of misappropriation, Flywheel benefitted from the fact that the information it stole was not generally known or readily available to the public or its competitors.

233.    The trade secrets at issue in this case have independent economic value to Compass by virtue of being unknown or not readily available to others in the industry.

234. Compass spent more than a decade compiling the information underlying the misappropriated trade secrets and engaged in the reasonable protection measures outlined herein to ensure that this trade secret information and proprietary business know how would not fall into the hands of competitors. Compass sought to protect the misappropriated information because Compass understood the trade secret information and proprietary business know how to be objectively valuable—*i.e.*, its "crown jewels"—and provided Compass with competitive advantages in the marketplace.

235. Flywheel and Ascential's access to, acquisition of, and subsequent unauthorized use of the Compass trade secret information and proprietary business know how has driven Flywheel's position in the market to the disadvantage of Compass, who would have otherwise maintained its relationships with clients solicited by Flywheel.

236. The independent economic value of the misappropriated trade secret information and proprietary business know how is reflected in the $400 million that Ascential paid to acquire Flywheel and Ascential's recent projections as to Flywheel's future growth, as identified above in paragraph 212 (depicting Ascential's Interim Report dated July 2021 with Flywheel financial projections).

237. Compass took reasonable steps to maintain the secrecy of the trade secret information and proprietary business know how. To the extent that the trade secrets at issue in this matter are now available to the public or Compass's competitors, it is because Defendants made such disclosures without Compass's authorization.

238. By misappropriating Compass's trade secrets, Flywheel, DiPaula, Miller, and Ascential are benefitting and have benefited from Compass's significant investment of energy, resources, and time. For example, DiPaula, Miller, Flywheel, and Ascential are using Compass's

client relationships, relationships with Amazon, independent analysis and scrutiny of Amazon's complex sales and marketing algorithms, and independent and unparalleled access to sales and consumer information from Amazon's platforms in order to compete with Compass in the eCommerce industry. Through this misappropriation, Flywheel, DiPaula, Miller, and Ascential have received an illicit head start and saved untold millions of dollars in independent client development and data analysis.

239.    The article and the Presentation discovered by Fernandez on January 20, 2020, demonstrates that Flywheel, DiPaula, Miller, and Ascential have used and are continuing to use Compass's trade secrets and proprietary business know how to profit from a competitive company built on Compass's experience and investments in the eCommerce industry such that Flywheel and Ascential can unfairly compete against Compass.

240.    Flywheel's business incorporates trade secrets and other proprietary business know how that DiPaula and Miller learned and developed while part of Compass's eCommerce team. Flywheel and Ascential use this misappropriated information to provide the same services Compass provides to many of the same clients that had previously been Compass eCommerce clients.

241.    Because DiPaula and Miller had little to no experience in the CPG or eCommerce industries prior to joining Compass, the proprietary business methods, processes, and platform communication strategies DiPaula and Miller utilize at Flywheel was fully conceived during their employment with Compass and constitutes Compass's trade secret information.

242.    DiPaula and Miller knew or had reason to know that their use of Compass's trade secrets was improper because they had a duty to limit the use of the trade secrets under the terms

of their employment with Compass. Flywheel, DiPaula, Miller, and Ascential had neither express nor implied consent from Compass to use its trade secrets to compete with Compass.

243.   Ascential has been fully on notice as to the trade secret misappropriation contentions set forth herein since May 2021 and has chosen to enable, participate in, and profit from the past and continued misappropriation of Compass's trade secret information.

244.   The actions alleged herein by Flywheel, DiPaula, Miller, and Ascential constitute misappropriation under the DTSA, as well as under the MUTSA.

245.   The misappropriation has caused and will continue to cause damage to Compass including, but not limited to, Compass's competitive disadvantage in relation to Flywheel, Compass's loss of business and market share to Flywheel to Flywheel's unjust enrichment, and the devaluation of Compass's trade secrets. Therefore, Compass is entitled to and requests an award of damages in its favor for actual loss caused by the misappropriation, damages for all unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss, and/or damages measured by imposition of liability for a reasonable royalty for the unauthorized disclosure or use of Compass's trade secrets.

246.   Flywheel, DiPaula, Miller, and Ascential have willfully and maliciously misappropriated Compass's trade secrets and have profited and continue to profit from Compass's trade secrets. Compass therefore is entitled to and requests exemplary damages in an amount not more than double Compass's actual damages, plus reasonable attorneys' fees and costs.

247.   As a result of Defendants' misappropriation of Compass's trade secrets, Compass has suffered and continues to suffer irreparable harm for which no adequate remedy at law exists, including without limitation the unauthorized use and disclosure of Compass's trade secrets and harm to Compass's competitive market position and business reputation.

58

248.    Under the DTSA and MUTSA, Compass is entitled to and requests permanent injunctive relief to prohibit Flywheel, DiPaula, Miller, and Ascential from using, disclosing, or retaining any of Compass's trade secrets.

## COUNT III – CIVIL RICO 18 U.S.C. § 1962(c)
### (All Defendants)

249.    Compass incorporates the prior paragraphs as if fully set forth herein.

250.    Defendants Flywheel, DiPaula, Miller, and Ascential share the common purpose of using Compass stolen trade secrets, proprietary business know how, and confidential information for economic gain.

251.    Since 2014, Miller, DiPaula, and Flywheel have used Compass's stolen trade secrets and Compass's proprietary information and business know how on a daily basis to run Flywheel's operations and create value for their customers in the eCommerce industry. This daily conduct amounts to misappropriation of trade secrets pursuant to 18 U.S.C. § 1832.

252.    Since Ascential's 2018 acquisition of Flywheel, Ascential has financially benefitted from Compass stolen trade secrets, proprietary business know how, and confidential information. This competitive benefit based on the acquirer's misuse of Compass's valuable and closely held information amounts to misappropriation of trade secrets pursuant to 18 U.S.C. § 1832.

253.    Defendants Flywheel, DiPaula, Miller, and Ascential share an economic relationship with one another and knowingly participate in the misappropriation of Compass's trade secrets, proprietary business know how, and confidential information.

254.    Defendants Michael, Daniel, and George White share the common purpose of harming Compass to hide the impropriety of their corporate spending for personal financial gain and their acts of facilitating and helping fund the use of the misappropriated Compass trade secrets,

59

proprietary business know how, and confidential information by Defendants Flywheel, DiPaula, Miller, and Ascential.

255. Since 2008, Michael and Daniel have knowingly engaged in a pattern of egregious behavior that includes:

a. Fraudulently representing their ownership interests in Compass;

b. Stealing money from Compass for fraudulent severance payments to DiPaula and Miller used to operate Flywheel in competition with Compass;

c. Creating unauthorized bank accounts to funnel Compass revenue to themselves in their personal capacity and through doing so committing money laundering (18 U.S.C. § 1956), mail fraud (18 U.S.C. § 1314), wire fraud (18 U.S.C. § 1343), and financial institution fraud (18 U.S.C. § 1314);

d. Giving corporate compensation and pension benefits to Debra, Kelly, and Emile White who were not Compass employees and in doing so committing embezzlement of a pension fund 18 U.S.C. § 664);

e. Issuing themselves unwarranted "tax checks" for personal financial gain and in doing so committing embezzlement;

f. Fraudulently claiming that they issued loans to the company and writing reimbursement checks to themselves from the Compass bank account for fake principal and interest payments in Maryland from June 7, 2015 to February 12, 2019; and

g. Filing lawsuits (December 2, 2019) and federal agency grievances (October 2019 with the U.S. Department of Labor) with knowingly false statements for the purpose of causing Compass financial harm and reputational damage.

256. Since April 29, 2019, George and Michael White have knowingly locked Compass out of the compassmarketinginc.com domain and held Compass business records and accounts hostage. The IT Lockout was done to cause Compass financial harm and reputational damage, and pressure Compass to accede to George's demands for a raise, additional benefits, and severance package and in doing so committing extortion (18 U.S.C. § 1961(1)).

257.     The above allegations show that the Defendants conducted an enterprise through a pattern of racketeering activity in interstate commerce involving at least two predicate acts within a 10-year period.

258.     As a result of Defendants' coordinated effort to cause Compass financial harm and reputational damage, Compass has suffered and continues to suffer actual damages.

### COUNT IV – CIVIL RICO CONSPIRACY 18 U.S.C. 1962(d)
### (All Defendants)

259.     Compass incorporates the prior paragraphs as if fully set forth herein.

260.     Defendants Flywheel, DiPaula, Miller, and Ascential share the common purpose of using Compass stolen trade secrets and Compass proprietary business know how for economic gain. Defendants Flywheel, DiPaula, Miller, and Ascential agreed to conspire to accomplish the wrongful acts detailed below as is evidenced by their past and continuing collaboration, duplicate acts, and common goals.

261.     Since 2014, Defendants Miller, DiPaula, and Flywheel have used Compass's stolen trade secrets and Compass's proprietary information and business know how on a daily basis to run Flywheel's operations and create value for their customers in the eCommerce industry. This past and ongoing conduct amounts to misappropriation of trade secrets pursuant to 18 U.S.C. § 1832.

262.     Since Ascential's 2018 acquisition of Flywheel, Ascential has financially benefitted from Compass stolen trade secrets, proprietary business know how, and confidential information. This competitive benefit based on the acquirer's misuse of Compass's valuable and closely held information amounts to misappropriation of trade secrets pursuant to 18 U.S.C. § 1832.

263. Defendants Flywheel, DiPaula, Miller, and Ascential share an economic relationship with one another and knowingly participate in the misappropriation of Compass's trade secrets, proprietary business know how, and confidential information.

264. Defendants Michael, Daniel, and George White share the common purpose of harming Compass to hide the impropriety of their corporate spending for personal financial gain and their acts of facilitating and helping fund the use of the misappropriated Compass trade secrets, proprietary business know how, and confidential information by Defendants Flywheel, DiPaula, Miller, and Ascential.

265. Since 2008, Michael and Daniel have knowingly engaged in a pattern of egregious behavior that includes:

    a. Fraudulently representing their ownership interests in Compass;

    b. Stealing money from Compass for fraudulent severance payments to DiPaula and Miller used to operate Flywheel in competition with Compass;

    c. Creating unauthorized bank accounts to funnel Compass revenue to themselves in their personal capacity and through doing so committing money laundering (18 U.S.C. § 1956), mail fraud (18 U.S.C. § 1314), wire fraud (18 U.S.C. § 1343), and financial institution fraud (18 U.S.C. § 1314);

    d. Giving corporate compensation and pension benefits to Debra, Kelly, and Emile White who were not Compass employees and in doing so committing embezzlement of a pension fund 18 U.S.C. § 664);

    e. Issuing themselves unwarranted "tax checks" for personal financial gain and in doing so committing embezzlement;

    f. Fraudulently claiming that they issued loans to the company and writing reimbursement checks to themselves from the Compass bank account for fake principal and interest payments in Maryland from June 7, 2015 to February 12, 2019; and

    g. Filing lawsuits (December 2, 2019) and federal agency grievances (October 2019 with the U.S. Department of Labor) with knowingly false statements for the purpose of causing Compass financial harm and reputational damage.

266. Since April 29, 2019, George and Michael White have knowingly locked Compass out of the compassmarketinginc.com domain and held Compass business records and accounts hostage. The IT Lockout was done to cause Compass financial harm and reputational damage, and pressure Compass to concede to George's demands for a raise, additional benefits, and severance package and in doing so committing extortion (18 U.S.C. § 1961(1)).

267. The above allegations show that the Defendants conducted an enterprise through a pattern of racketeering activity in interstate commerce involving at least two predicate acts within a 10-year period.

268. As a result of Defendants' coordinated effort to cause Compass financial harm and reputational damage, Compass has suffered and continues to suffer actual damages.

**COUNT V – BREACH OF CONTRACT**
**(DiPaula & Miller)**

269. Compass incorporates the prior paragraphs as if fully set forth herein.

270. Compass's offer of employment required DiPaula and Miller to be bound by the terms of the "Agreement[s] Relating to Employment and Post Employment," the Employee Handbook, and Compass policies and procedures.

271. The "Agreement Relating to Employment and Post Employment" states:

    a. Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where recognized by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employment Agreement at 1.

    b. During the period of Employee's employment with COMPASS and for a period of two years following the termination of Employee's employment, regardless of the reason for termination, Employee shall not, directly or indirectly: (i) induce or encourage any employee of COMPASS to leave the employ of COMPASS, (ii) hire any individual who is or was an employee of COMPASS as of the date of employee's termination of employment or within a one year period prior to such date, or (iii) induce or encourage any customer, client,

63

potential customer, potential client and/or other business relation of COMPASS to not do business or cease or reduce doing business with COMPASS or in any way interfere with the relationship between any such customer, client, potential client, supplier or other business relation and COMPASS. Employment Agreement at 2.

272.    The Employee Handbook prohibits:

a.    Theft, misappropriation or unauthorized possession or use of property, documents, records or funds belonging to the Company, or any client or employee; removal of same from Company premises without authorization.

b.    Divulging trade secrets or other confidential business information to any unauthorized persons or to others without an official need to know.

c.    Obtaining unauthorized confidential information pertaining to clients or employees. Employee Handbook at 12.

273.    DiPaula and Miller agreed to the terms of the "Agreement Relating to Employment and Post Employment," the Employee Handbook, and Compass policies and procedures in consideration for jobs, salaries, and benefits, including $1,000 for agreeing to be bound by the terms of the "Agreement Relating to Employment and Post Employment."

274.    DiPaula and Miller breached the terms of the "Agreement Relating to Employment and Post Employment" by:

a.    Stealing Compass trade secrets, and proprietary business know how to found and operate their business at Flywheel;

b.    Soliciting Compass clients to join Flywheel; and

c.    Soliciting potential eCommerce client Proctor and Gamble ("P&G") by lying about the state of Compass's eCommerce Department and slowing negotiations with P&G while DiPaula and Miller were still Compass employees.

275.    DiPaula and Miller breached the terms of the Employee Handbook by:

a.    Stealing Compass trade secrets and in particular, misappropriating the Compass eCommerce Guide;

b.    Divulging trade secrets and/or confidential and proprietary business information to Flywheel, its clients, and the general public as evidenced by Miller's 2015 Flywheel Power Point presentation at the Grocers Summit; and

64

c. Obtaining unauthorized confidential information pertaining to clients or employees by requesting client information from Compass employees after DiPaula and Miller left the Company and started Flywheel.

276. As a result of the above breaches of contract, DiPaula and Miller caused Compass to incur significant actual damages. These damages are ongoing since Flywheel, DiPaula, Miller, and Ascential continue to use Compass trade secrets and proprietary know how to operate the Flywheel business.

## COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACT
### (DiPaula, Miller, and Flywheel)

277. Compass incorporates the prior paragraphs as if fully set forth herein.

278. Compass entered into valid and enforceable contracts with CPG clients.

279. Defendants DiPaula, Miller, and Flywheel knew about the contracts because they were former Compass employees who worked with these CPG clients on a daily basis.

280. Defendants intentionally interfered with the Compass contracts by poaching a long list of Compass eCommerce clients, including well-established brands such as Allergan, Amplify Snacks Brands, Colgate, Ferrero, J&J, Mars, McCormick, Old Wisconsin, Proctor and Gamble ("P&G") and 5 Hour Energy.

281. Defendants also intentionally interfered with Compass contracts by recruiting Compass employees who worked on the CPG client accounts to join Flywheel, knowing that the brain trust provided a valuable service that could not be duplicated.

282. Defendants' actions caused these eCommerce clients to terminate their contracts with Compass and hire Flywheel so the clients could receive the same services by the same employees that handled the accounts at Compass.

283. As a result of Defendants' interference, Compass suffered actual damages.

## COUNT VII – TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE
### (Flywheel, DiPaula, Miller)

284.    Compass incorporates the prior paragraphs as if fully set forth herein.

285.    Defendants DiPaula and Miller intentionally and maliciously lied to potential Compass eCommerce client Proctor & Gamble when they said that Compass was getting out of the eCommerce business.

286.    DiPaula and Miller lied in an attempt to end the Compass and P&G relationship, to prevent P&G from entering into an eCommerce contract with Compass, and to facilitate Flywheel's engagement of P&G as a client.

287.    As a result of DiPaula and Miller's deceit, Compass lost the prospective advantage as P&G ceased conversations about hiring Compass for its eCommerce services.

288.    Later, Flywheel acquired and retained P&G as an eCommerce client.

289.    As a result of DiPaula, Miller, and Flywheel's conduct, Compass suffered actual damages.

## COUNT VIII – UNFAIR COMPETITION
### (Flywheel, DiPaula, Miller, and Ascential)

290.    Compass incorporates the prior paragraphs as if fully set forth herein.

291.    Defendants Flywheel, DiPaula, Miller, and Ascential engaged in a coordinated series of unfair and deceptive acts intended to damage and destroy Compass's business and ultimately steal Compass's eCommerce customers.

292.    Flywheel, Miller, and DiPaula stole Compass's trade secrets and other proprietary and confidential business information and know how, and used same to form the competitor entity Flywheel and continue to use Compass's trade secrets, proprietary business know how, and confidential information to poach clients and Compass employees.

293.    Flywheel's success both in terms of increased revenue year over year and its eventual $400 million acquisition by Ascential would not have been possible but for Flywheel's reliance on Compass's stolen trade secrets and proprietary information and know how.

294.    Flywheel's continued success following the Ascential acquisition would not have been possible but for Ascential's reliance on Compass's stolen trade secrets and proprietary information and know how.

295.    As a result of the unfair and deceptive statements and conduct directed at Compass and Compass's eCommerce customers by Flywheel, DiPaula, Miller, and Ascential, Compass's business was severely damaged through the loss of valuable business relationships with eCommerce customers in Maryland and other locations.

296.    When they were employees and executives of Compass, DiPaula and Miller owed fiduciary duties to Compass.

297.    DiPaula and Miller breached their fiduciary duties through their misappropriation of trade secrets and other confidential and proprietary information belonging to Compass.

298.    DiPaula and Miller's breaches of their fiduciary duties harmed Compass, including because Compass's confidential and proprietary information, including its business know how, was misused to usurp from Compass its corporate opportunities and Compass's resources were converted for the benefit of others.

299.    As a result of Flywheel, DiPaula, Miller, and Ascential's conduct, Compass suffered actual damages.

### COUNT IX – UNJUST ENRICHMENT
### (DiPaula, Miller, Flywheel, and Ascential)

300.    Compass incorporates the prior paragraphs as if fully set forth herein.

301. By reason of improper conduct by Flywheel, DiPaula, Miller, and Ascential, Defendants have enriched themselves and the corporate entities with which they are affiliated.

302. Flywheel, DiPaula, Miller, and Ascential have profited and continue to profit from use of Compass's trade secret, proprietary, and confidential information. In particular, Flywheel, DiPaula, and Miller have received as much as $400 million from Ascential as a direct result of their unauthorized and unlawful use of Compass's trade secret, proprietary, and confidential information.

303. Flywheel, DiPaula, Miller, and Ascential have willfully and maliciously misappropriated Compass's trade secret, proprietary, and confidential information. Ascential knew or was informed no later than May 2021 that it was profiting from Compass's trade secret, proprietary, and confidential information, chose to take no action despite its knowledge that it is unlawfully benefitting from Compass's intellectual property, and continues to enjoy the financial benefits from the actionable misconduct of Flywheel, DiPaula, and Miller.

304. As a consequence of the unlawful acquisition, use, and/or disclosure of Compass's trade secret, proprietary, and confidential information by Flywheel, DiPaula, Miller, and Ascential, Compass has suffered an impoverishment.

305. Defendants' enrichment and Compass's impoverishment were without justification or cause.

306. It is inequitable for Flywheel, DiPaula, Miller, and Ascential to profit and continue to profit from Compass's stolen trade secret, proprietary, and confidential information. Should Compass have no other remedy in law against Flywheel, DiPaula, Miller, and Ascential for their various tortious misconduct, each defendant is bound to compensate Compass in an amount equal to their respective unjust enrichment.

68

## COUNT X – FRAUDULENT CONCEALMENT/FRAUD
### (All Defendants)

307.    Compass incorporates the prior paragraphs as if fully set forth herein.

308.    All defendants have committed countless wrongful acts and misrepresentations in order to conceal and further perpetuate the schemes detailed above, including misappropriation of Compass's trade secret, proprietary, and confidential information and racketeering schemes.

309.    Specifically, DiPaula, Miller, and Flywheel worked in concert to conceal the misappropriation of Compass's trade secrets to found and operate Flywheel as a competing eCommerce entity.  Michael and Daniel White worked in concert to support Flywheel by issuing checks that involved Compass funds to Chip DiPaula that he used to fund and operate the Flywheel business. George White engaged in the alleged IT misconduct to interfere with Compass's business in competition with Flywheel, among other things.  Ascential, through its acquisition of and post-acquisition support of Flywheel's business, has worked to continually conceal the past and continued misappropriation of Compass's trade secrets and proprietary business information and know how.

310.    Michael and Daniel White owed a duty to Compass to disclose their financial decisions and conflicting financial interests as Compass officers, yet worked tirelessly to actively conceal and misrepresent their actions, as pleaded above and which included:

   a.  Fraudulently representing their ownership interests in Compass;

   b.  Stealing money from Compass for fraudulent severance payments to DiPaula and Miller used to operate Flywheel in competition with Compass;

   c.  Creating unauthorized bank accounts to funnel Compass revenue to themselves in their personal capacity and through doing so committing money laundering (18 U.S.C. § 1956), mail fraud (18 U.S.C. § 1314), wire fraud (18 U.S.C. § 1343), and financial institution fraud (18 U.S.C. § 1314);

69

d.  Giving corporate compensation and pension benefits to Debra, Kelly, and Emile White who were not Compass employees and in doing so committing embezzlement of a pension fund 18 U.S.C. § 664);

e.  Issuing themselves unwarranted "tax checks" for personal financial gain and in doing so committing embezzlement;

f.  Fraudulently claiming that they issued loans to the company and writing reimbursement checks to themselves from the Compass bank account for fake principal and interest payments in Maryland from June 7, 2015 to February 12, 2019; and

g.  Filing lawsuits (December 2, 2019) and federal agency grievances (October 2019 with the U.S. Department of Labor) with knowingly false statements for the purpose of causing Compass financial harm and reputational damage.

311.  Compass justifiably relied upon Michael and Daniel's deceitful actions, including by declining to pursue legal action against DiPaula, Miller, Flywheel, and former Flywheel employees due to Daniel's conflicted legal advice that resulted from his undisclosed financial interest in Flywheel.

312.  As a result of Defendants' fraud and concealment, Compass was unable to uncover the misappropriation of its trade secret, proprietary, and confidential information and, as a result, suffered actual damages including, but not limited to, loss of economic value of its trade secret, proprietary, and confidential information, loss of clients, revenues, economic opportunities, investments, and employees. As a further result of Defendants' actions, Compass has suffered actual damages from years of embezzlement and fraud and legal fees from unwarranted lawsuits intended to conceal Defendants' actions.

## COUNT XI – CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS
### (All Defendants)

313.  Compass incorporates the prior paragraphs as if fully set forth herein.

314. Defendants agreed to work together and in concert to benefit Flywheel and cause financial harm and reputational damage to Compass, as evidenced by the coordinated actions of Defendants to:

a. Steal Compass trade secrets, and proprietary information;

b. Provide Flywheel with access to the stolen Compass trade secrets, and proprietary information; and

c. Financially support Flywheel, through unwarranted payments to Chip DiPaula, as Flywheel continuously misappropriates Compass trade secrets, and proprietary information.

315. As a result of Defendants' coordinated effort to benefit Flywheel and cause financial harm and reputational damage to Compass, Compass suffered and continues to suffer actual damages.

## COUNT XII – CONSPIRACY TO BREACH CONTRACT
### (DiPaula & Miller)

316. Compass incorporates the prior paragraphs as if fully set forth herein.

317. Defendants DiPaula and Miller agreed to work together and in concert to breach their "Agreement[s] Relating to Employment and Post Employment" to benefit Flywheel and for personal financial gain, as evidenced by the coordinated actions of Defendants to:

a. Use Compass trade secrets, and confidential and proprietary information to found and operate their business at Flywheel;

b. Solicit Compass employees Alex McCord, Dayna Acevedo, Justin Liu, Mike Menefee and Mike O'Donnell who ultimately resigned from Compass and joined Flywheel; and

c. Solicit Compass potential eCommerce client Proctor and Gamble ("P&G") causing it to terminate negotiations, and Compass clients including Allergan, Amplify Snacks Brands, Colgate, Ferrero, J&J, Mars, McCormick, Old Wisconsin, and 5 Hour Energy which ultimately terminated their service contracts with Compass and hired Flywheel.

71

318.    As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages.

### COUNT XIII – CONSPIRACY TO TORTIOUSLY INTERFERE WITH CONTRACTS
(**DiPaula, Miller, and Flywheel**)

319.    Compass incorporates the prior paragraphs as if fully set forth herein.

320.    Defendants DiPaula, Miller, and Flywheel agreed to work together and in concert to intentionally interfere with Compass client contracts as is evidenced by the coordinated actions of Defendants to cause Allergan, Amplify Snacks Brands, Colgate, Ferrero, J&J, Mars, McCormick, Old Wisconsin, and 5 Hour Energy to terminate their contracts with Compass and hire Flywheel to provide the same eCommerce marketing services.

321.    As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages.

### COUNT XIV – CONSPIRACY TO TORTIOUSLY INTERFERE WITH PROSPECTIVE ADVANTAGE
(**DiPaula, Miller, and Flywheel**)

322.    Compass incorporates the prior paragraphs as if fully set forth herein.

323.    Defendants DiPaula, Miller, and Flywheel agreed to work together and in concert to prevent Compass from obtaining an eCommerce contract with Proctor & Gamble ("P&G") as evidenced by the coordinated actions of Defendants to intentionally and maliciously lie and tell P&G corporate representatives that Compass was getting out of the eCommerce business.

324.    As a result of Defendants' coordinated effort to end the Compass and P&G relationship so Flywheel could attempt to retain P&G as a client, Compass has suffered and continues to suffer actual damages.

### COUNT XV – CONSPIRACY TO UNFAIRLY COMPETE
(**All Defendants**)

325.    Compass incorporates the prior paragraphs as if fully set forth herein.

72

326. Defendants agreed to work together and in concert to damage and destroy Compass's business and ultimately steal Compass's eCommerce customers as evidenced by the coordinated actions of Defendants to:

   a. Steal Compass trade secrets and other proprietary and confidential information;

   b. Use such information to found Flywheel; and

   c. Continue to use Compass trade secrets and other proprietary and confidential information to poach clients and Compass employees.

327. As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages.

### COUNT XVI – CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT/FRAUD
### (All Defendants)

328. Compass incorporates the prior paragraphs as if fully set forth herein.

329. Defendants agreed to work together and in concert to conceal their schemes to benefit from Compass's trade secrets and confidential and proprietary information and otherwise profit from Compass unlawfully, as evidenced by the coordinated actions of Defendants:

   a. Fraudulently representing their ownership interests in Compass;

   b. Stealing money from Compass for fraudulent severance payments to DiPaula and Miller used to operate Flywheel in competition with Compass;

   c. Creating unauthorized bank accounts to funnel Compass revenue to themselves in their personal capacity and through doing so committing money laundering (18 U.S.C. § 1956), mail fraud (18 U.S.C. § 1314), wire fraud (18 U.S.C. § 1343), and financial institution fraud (18 U.S.C. § 1314);

   d. Giving corporate compensation and pension benefits to Debra, Kelly, and Emile White who were not Compass employees and in doing so committing embezzlement of a pension fund 18 U.S.C. § 664);

   e. Issuing themselves unwarranted "tax checks" for personal financial gain and in doing so committing embezzlement;

   f. Fraudulently claiming that they issued loans to the company and writing reimbursement checks to themselves from the Compass bank account for fake

73

principal and interest payments in Maryland from June 7, 2015 to February 12, 2019; and

g. Filing lawsuits (December 2, 2019) and federal agency grievances (October 2019 with the U.S. Department of Labor) with knowingly false statements for the purpose of causing Compass financial harm and reputational damage.

330. As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages.

## COUNT XVII – AIDING AND ABETTING MISAPPROPRIATION OF TRADE SECRETS
### (DiPaula, Miller, and Flywheel)

331. Compass incorporates the prior paragraphs as if fully set forth herein.

332. DiPaula, Miller, Flywheel substantially assisted and encouraged one another to use Compass's trade secrets, proprietary business know how, and confidential information in order to compete with Compass in the eCommerce industry.

333. As a result, Compass suffered and continues to suffer actual damages.

## COUNT XVIII – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH CONTRACTS
### (DiPaula, Miller, and Flywheel)

334. Compass incorporates the prior paragraphs as if fully set forth herein.

335. Defendants DiPaula, Miller, and Flywheel substantially assisted and encouraged one another to intentionally interfere with Compass contracts as is evidenced by the coordinated actions of Defendants to cause Allergan, Amplify Snacks Brands, Colgate, Ferrero, J&J, Mars, McCormick, Old Wisconsin, and 5 Hour Energy to terminate their contracts with Compass and hire Flywheel to provide the same eCommerce marketing services.

336. As a result, Compass suffered and continues to suffer actual damages.

## COUNT XIX – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE
### (DiPaula, Miller, and Flywheel)

337. Compass incorporates the prior paragraphs as if fully set forth herein.

338. Defendants DiPaula, Miller, and Flywheel substantially assisted and encouraged one another to prevent Compass from obtaining an eCommerce contract with Proctor & Gamble ("P&G") as evidenced by the coordinated actions of Defendants to intentionally and maliciously lie and tell P&G corporate representatives that Compass was getting out of the eCommerce business.

339. As a result, Compass suffered and continues to suffer actual damages.

## COUNT XX – AIDING AND ABETTING UNFAIR COMPETITION
### (DiPaula, Miller, and Flywheel)

340. Compass incorporates the prior paragraphs as if fully set forth herein.

341. DiPaula, Miller, Flywheel substantially assisted and encouraged one another to commit a coordinated series of unfair and deceptive acts intended to damage and destroy Compass's business and ultimately steal Compass's eCommerce customers.

342. As a result, Compass suffered and continues to suffer actual damages.

## COUNT XXI – AIDING AND ABETTING FRAUDULENT CONCEALMENT/FRAUD
### (All Defendants)

343. Compass incorporates the prior paragraphs as if fully set forth herein.

344. Defendants substantially assisted and encouraged one another to conceal their schemes to benefit from Compass's trade secrets and confidential and proprietary information and otherwise profit from Compass unlawfully, as evidenced by the coordinated actions of Defendants:

      a. Fraudulently representing their ownership interests in Compass;

      b. Stealing money from Compass for fraudulent severance payments to DiPaula and Miller used to operate Flywheel in competition with Compass;

75

c.  Creating unauthorized bank accounts to funnel Compass revenue to themselves in their personal capacity and through doing so committing money laundering (18 U.S.C. § 1956), mail fraud (18 U.S.C. § 1314), wire fraud (18 U.S.C. § 1343), and financial institution fraud (18 U.S.C. § 1314);

d.  Giving corporate compensation and pension benefits to Debra, Kelly, and Emile White who were not Compass employees and in doing so committing embezzlement of a pension fund 18 U.S.C. § 664);

e.  Issuing themselves unwarranted "tax checks" for personal financial gain and in doing so committing embezzlement;

f.  Fraudulently claiming that they issued loans to the company and writing reimbursement checks to themselves from the Compass bank account for fake principal and interest payments in Maryland from June 7, 2015 to February 12, 2019; and

g.  Filing lawsuits (December 2, 2019) and federal agency grievances (October 2019 with the U.S. Department of Labor) with knowingly false statements for the purpose of causing Compass financial harm and reputational damage.

345.  As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages.

## COUNT XXII – CONVERSION
### (Michael and George White)

346.  Compass incorporates the prior paragraphs as if fully set forth herein.

347.  Michael and George White intentionally and wrongful exercised dominion and control over Compass's personal property, as alleged above and including by George White's acts to intentionally and maliciously cut off Compass access to employee email accounts with the compassmarketinginc.com domain, Microsoft, QuickBooks, and other business records and accounts.

348.  Consequently, Compass was not able to communicate by email with clients or otherwise access the records required to do business. Compass had to rebuild its IT infrastructure and establish a new compassmarketinginc.net domain at significant expense.

76

349.    Compass expended significant effort, time, and money to create new accounts and business records. Compass employees engaged in the time-consuming task of reaching out to clients and leads to address problems arising from missing records and provide new contact information.

350.    Michael and George White continue to intentionally and wrongfully exercise dominion and control over Compass's network, and, on information and belief will continue to do so unless enjoined.

351.    As a result of Defendants' conversion of Compass's network, Compass suffered and continues to suffer actual damages.

## COUNT XXIII – BREACH OF FIDUCIARY DUTY

### (Daniel White and Michael White)

352.    Compass incorporates the prior paragraphs as if fully set forth herein.

353.    As directors and officers of Compass, Daniel White and Michael White owed fiduciary duties of care, loyalty, and good faith to Compass. Daniel White and Michael White's fiduciary duties included an obligation to exercise good business judgment, to act prudently in the operation of Compass' business, to discharge their actions in good faith, to act in the best interest of Compass and its shareholders, and to put the interests of Compass before their own.

354.    Daniel White and Michael White breached their fiduciary duty of care by, among other things:

a. Using Compass funds to issue fraudulent severance payments to DiPaula to operate Flywheel; and

b. Assisting Flywheel with its misappropriation of Compass' trade secrets and proprietary know how;

c.  Helping Flywheel succeed to Compass' detriment.

77

355.    Daniel White and Michael White breached their fiduciary duty of loyalty and good faith by, among other things:

      d.   Opening secret bank accounts in Compass' name to take corporate funds from Compass for their personal benefit;

      e.    Hiring ghost employees to benefit themselves and their families to Compass' detriment;

      f.   Engaging in the Tax Check Scheme to drain funds from Compass for their personal benefit;

      g.   Engaging in the Shareholder Loan Scheme to drain funds from Compass for their personal benefit; and

      h.   Charging personal expenses to their Compass corporate credit cards and having Compass pay the expenses.

356.    Daniel White and Michael White intentionally and maliciously breached their fiduciary duties to Compass to benefit themselves and others, and to cause harm to Compass.

357.    Daniel White and Michael White's breaches caused substantial financial harm and reputational damage to Compass that continues to this day.

## JURY DEMAND

358.    Pursuant to Federal Rule of Civil Procedure 38(b), Compass demands a trial by jury as to all issues so triable in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Compass prays for the following relief:

359.    Enter judgment in Compass's favor on of the Counts identified herein;

360.    Enter judgment against the named Defendants, jointly and severally, as identified in each of the above-referenced Counts;

361.    Compensatory damages for all losses caused by Defendants' wrongful conduct, including actual damages due to Defendants' wrongful conduct pursuant to 18 U.S.C. § 1836(b)(3)(B)(i) and Md. Code Com. Law § 11-1202;

78

362. Treble damages pursuant to 18 U.S.C. § 1964(c);

363. Equitable relief pursuant to 18 U.S.C. § 1836(b)(3)(B)(i) and Md. Code Com. Law § 11-1202;

364. Punitive and exemplary damages for Defendants' willful and malicious conduct pursuant to 18 U.S.C. § 1836(b)(3)(C) and Md. Code Com. Law § 11-1203;

365. Reasonable attorneys' fees and costs incurred in connection with this lawsuit pursuant to 18 U.S.C. § 1836(b)(3)(D), 18 U.S.C. § 1964(c), and Md. Code Com. Law § 11-1204;

366. Damages for conversion of Compass's personal property in an amount no less than fair market value of Compass's network and the information thereon, including trade secret information;

367. Injunctive relief barring Defendants from using or disclosing Compass's trade secrets, proprietary business know how, and confidential information and ordering Defendants to return to Compass all documents and materials containing Compass's trade secret, proprietary, and confidential information;

368. Injunctive relief barring Defendants from directly or indirectly soliciting, inducting or encouraging any entity or person who is a client of Compass, or otherwise tortiously interfering with Compass's contracts or prospective advantage;

369. Injunctive relief barring Defendants from accessing or controlling Compass's networks;

370. An order returning control of Compass's network to Compass;

371. An award of prejudgment interest and costs of suit to the extent permitted by law; and

372. Any such other relief as the Court may deem just and proper.

79

Dated: February 14, 2022                    Respectfully submitted,

*/s/ Steven A. Luxton, Esq.*
Steven A. Luxton, Esq. (MD Bar No. 9812160173)
Natalie A. Bennett, Esq. (*pro hac vice forthcoming*)
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue
7th Floor
Washington, DC 20004-2541
steven.luxton@morganlewis.com
natalie.bennett@morganlewis.com
T. (202) 739-5559
F. (202) 739-3001

Troy S. Brown, Esq. (*pro hac vice forthcoming*)
Rachel A. Ward, Esq. (*pro hac vice forthcoming*)
**Morgan, Lewis & Bockius LLP**
1701 Market Street
Philadelphia PA 19103
troy.brown@morganlewis.com
rachel.ward@morganlewis.com
T. (215) 963-5000
F (215) 963-5001

James J. Kritsas (*pro hac vice forthcoming*)
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive
Chicago, IL 60606
james.kritsas@morganlewis.com
T. (312) 324-1000
F. (312) 324-1001

Susan K. Stradley (*pro hac vice forthcoming*)
**Morgan, Lewis & Bockius LLP**
1000 Louisiana Street
Suite 4000
Houston, TX 77002
susan.stradley@morganlewis.com
T. (713) 890-5000
F. (713) 890-5001
*Counsel for Plaintiff Compass Marketing, Inc.*

80